CONCERNED CITIZENS FOR the PRES-
ERVATION OF CLARKSVILLE
et al., Plaintiffs-Appellants,

v.

John A. VOLPE et al., Defendants-
Appellees.

No. 30286.

United States Court of Appeals,
Fifth Circuit.

June 9, 1971.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1971.

Barbara Anne Kazen, Austin, Tex., J.
Anthony Kline, National Housing & De-
velopment, Law Project, Earl Warren,
Legal Institute, Univ. of Calif., Berkeley,
Cal., Gabriel Gutierrez, Jr., Thomas
English Edmundson, Austin, Tex., for
plaintiffs-appellants.

Seagal V. Wheatley, U. S. Atty., San
Antonio, Tex., Watson Arnold, Dudley
Fowler, Asst. Attys. Gen., Charles Dip-
pel, Asst. City Atty., Austin, Tex., Lloyd
R. Reeder, Fort Worth, Tex., for de-
fendants-appellees.

Before SKELTON *, Judge, and MOR-
GAN and CLARK, Circuit Judges.

* Honorable Byron G. Skelton, U. S. Court of Claims, Washington, D. C. sitting by designation.

LEWIS R. MORGAN, Circuit Judge:

This is an action for declaratory and injunctive relief brought by certain residents of the Clarksville area of Austin, Texas, who have been displaced by an interstate highway project known as the Missouri-Pacific Expressway (hereafter, the Mo-Pac Expressway), in behalf of themselves and the class they represent. The district court granted summary judgment for the defendants, and the plaintiffs appeal. We affirm in part and reverse and remand in part.

The Mo-Pac Expressway project had its genesis on September 1, 1966, when officials of the City of Austin and Travis County appeared before the Texas Highway Commission to request the assistance and financial participation of the Texas Highway Department in the development of a controlled access highway along a route identified as Missouri-Pacific Boulevard, extending from a junction with U. S. Highway 183 north of Austin, and generally along the route of the Missouri-Pacific Railroad to West First Street and thence south and southwesterly to a junction with the proposed West Loop (Loop 360) southwest of Austin. This route reflected proposals contained in the Austin Development Plan adopted by the City Council of Austin on June 8, 1961, and the Austin Transportation Plan, prepared by the City of Austin and the Texas Highway Department in cooperation with the Federal Bureau of Public Roads. The Texas Highway Department agreed to participate in the further planning and financing of construction of the proposed expressway with minor modifications on October 28, 1966. Under the terms of the agreement, the City of Austin was to provide at its own expense all right-of-way for the expressway within its city limits. On December 21, 1967, engineering studies and schematic plans for construction of the Mo-Pac Expressway prepared by the Texas Highway Department were forwarded to the Federal Bureau of Public Roads, a sub-agency within the Department of Transportation (hereafter DOT). A route-sketch map of the expressway was subsequently forwarded to the Bureau of Public Roads on January 12, 1968, and certain further documentation was supplied soon thereafter. Federal approval was required because the expressway was to become a primary federal-aid project. A public hearing concerning the proposed expressway was held by the Texas Highway Department on February 6, 1968. As a result of that hearing, the Texas Highway Commissioners, acting for the Texas Highway Department, issued a minute order dated March 1, 1968, which provided formal state approval of the route and schematic plan for the Mo-Pac Expressway project. On May 21, 1968, the DOT approved the proposed route and, with certain modifications, the schematic plan for the Mo-Pac Expressway and the results of the public hearing held on February 6, 1968, and authorized the commencement of physical development of the expressway and indicated that, on the basis of the approved plan, federal financing for construction would be forthcoming.

The route of the Mo-Pac Expressway passes through the Western boundary of Clarksville roughly parallel to the existing route of the Missouri-Pacific Railroad tracks. At the time of hearing the motion for summary judgment before the district court, all but three of the families displaced from the Clarksville community had been relocated. In oral argument before this court, counsel for the appellees stated that all persons displaced from the Clarksville community as a result of the expressway project had been relocated, and counsel for appellants did not contradict this assertion.

The appellants, the plaintiffs below, make four principal contentions in support of the relief they seek: (1) that the federal and state highway officials failed to comply with the applicable federal relocation statutes and regulations regarding pre-displacement relocation assurances by state officials to DOT; (2) that DOT has failed to establish timely procedures to enforce the federal relocation requirements, thereby depriving the displacees from Clarksville of their right

to due process of law; (3) that the displacement of Blacks and Mexican-Americans in a discriminatory housing market without adequate government measures to assure non-discriminatory replacement housing deprives such displacees of the equal protection of the laws; [1] and (4) that the single public hearing on the expressway project failed to comply with the requirements set forth in the applicable statutes and regulations, and that a further hearing should be required. The contentions relating to compliance with the pre-displacement assurance requirements of the federal statutes and regulations regarding relocation will be dealt with in the first part of this opinion; the contention regarding the adequacy of the hearing will be dealt with in the second part.

1. Plaintiffs-appellants assert that the population of the Clarksville community is approximately 65% Negro, 32% Mexican-American, and 3% White.

2. Under Section 502, the Secretary is to receive satisfactory assurances that:

(1) fair and reasonable relocation and other payments shall be afforded to displaced persons in accordance with sections 505, 506, and 507 of this title;

(2) relocation assistance programs offering the services described in section 508 of this title shall be afforded to displaced persons; and

(3) within a reasonable period of time prior to displacement there will be available, to the extent that can reasonably be accomplished, in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by the Secretary, equal in number to the number of and available to such displaced families and individuals and reasonably accessible to their places of employment.

Complementing Section 502 is Section 508, which provides in relevant part:

(a) Each State shall provide a relocation advisory assistance program which shall include such measures, facilities, or services as may be necessary or appropriate in order—

(1) to determine the needs, if any, of displaced families, individuals, business concerns, and farm operators for relocation assistance;

(2) to assure that, within a reasonable period of time, prior to displacement there will be available, to the ex-

## I.

Under Section 502 of the Federal-Aid Highway Act of 1968, 82 Stat. 830, 23 U.S.C. § 501 et seq., (Supp.1971) (hereafter, the Act), the Secretary of Transportation is prohibited from approving any federal-aid highway project which will cause the displacement of any person, business or farm operation unless he received satisfactory assurances concerning their relocation from the state highway department.[2] Pursuant to 23 U.S.C. § 510, the Secretary issued DOT Instructional Memorandum 80–1–68 (hereafter, IM 80–1–68) setting forth the manner in which state highway departments were to comply with the pre-displacement assurance requirements of the Act.[3]

tent that can reasonably be accomplished, in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, housing meeting the standards established by the Secretary for decent, safe, and sanitary dwellings, equal in number to the number of, and available to, such displaced families and individuals and reasonably accessible to their places of employment;

(3) to assist owners of displaced businesses and displaced farm operators in obtaining and becoming established in suitable locations; and

(4) to supply information concerning the Federal Housing Administration home acquisition program under section 221(d) (2) of the National Housing Act, the small business disaster loan program under section 7(b) (3) of the Small Business Act, and other State or Federal programs offering assistance to displaced persons.

\*      \*      \*      \*      \*

3. Paragraph 5 of IM 80–1–68, relating to compliance with Section 502 of the Act, states:

No State highway department shall be authorized to proceed with any phase of any project which will cause displacement of any person or any construction project concerning any right-of-way acquired by the State without Federal participation \* \* \* until it has furnished satisfactory assurances, to the extent State law permits, that:

(1) Relocation payments and services were or will be provided as set forth in paragraphs 6–10 of this memorandum.

Note 3—Continued

(2) In the event housing available to persons without regard to race, color, religion, or national origin will not be available within a reasonable period of time prior to displacement as provided in paragraph 7 of this memorandum, the State shall provide a detailed statement specifying the respects in which such assurance cannot be furnished, the extent to which such housing will be available· prior to displacement, the period of time prior to displacement when that housing will become available and an estimate of the additional time within which such housing will become available to the extent that it can be reasonably accomplished.

(3) The public was or will be adequately informed of the relocation payments and services which will be available, as set forth in paragraph 12 of this memorandum.

(4) No person occupying the real property shall be required to move from his home, farm or business location without at least 90 days written notice of the intended vacation date from the State or political subdivision having responsibility for such acquisition. This provision must be carried out to the maximum extent practicable and exceptions should be made only in the case of very unusual conditions. Such assurance can be furnished on a Statewide basis or set forth in Point 31 of the State's statement of organization and procedures.

(5) The State's relocation program is realistic and is adequate to provide: orderly, timely, and efficient relocation of displaced individuals and families to decent, safe, and sanitary housing available to persons without regard to race, color, religion or national origin with minimum hardship on those affected.

Paragraph 7(a); provides that during the "conceptual stage" of a project (i. e., the time prior to final location approval) the state highway department shall make preliminary investigations which will furnish the following information with respect to each proposed location:

(1) Approximate number of individuals, families, businesses, farms, and nonprofit organizations that would be displaced.

(2) The probable availability of decent, safe, and sanitary replacement housing within the financial means of those displaced.

(3) The basis upon which the above findings were made and a statement relative thereto by the State to the Bureau of Public Roads.

Section 7(b) provides that after the conceptual stage has passed, but prior to proceeding with right-of-way negotiations, the state highway department shall furnish the following additional information:

(1) The methods and procedures by which the needs of every individual to be displaced will be evaluated and correlated with available decent, safe, and sanitary housing at reasonable rents or prices and readily accessible to his place of employment.

(2) The method and procedure by which the State will assure an inventory of currently available comparable housing available to persons without regard to race, color, religion, or national origin which is decent, safe, and sanitary, including type of building, state of repair, number of rooms, needs of the person or family being displaced (based on standards outlined in paragraph 13a), type of neighborhood, proximity or public transportation and commercial shopping areas, and distance to any pertinent social institutions, such as church, community facilities, etc. The use of maps, charts, plats, etc., would be useful at this stage.

(3). An analysis relating to the characteristics of the inventories so as to develop a relocation plan which will:

(a) outline the various relocation problems disclosed by the above survey;

(b) provide an analysis of Federal, State, and community programs affecting the availability of housing currently in operation in the project area;

(c). provide detailed information on concurrent displacement and relocation by other governmental agencies or private concerns;

(d) provide an analysis of the problems involved and method of operation to resolve and relocate the relocatees;

(e) estimate the amount of leadtime required and demonstrate its adequacy to carry out a timely, orderly and humane relocation program;

(f) assure no person lawfully occupying real property shall be required to move without at least 90 days written notice; and

(g) furnish the names of the agency or agencies, if other than the State, which will provide the relocation assistance including an analysis of their present workload and ability to perform and the estimated number and job titles of relocation personnel servicing the project.

In a letter to J. F. Cary, the Divisional Engineer of the Bureau of Public Roads charged with the federal supervision of the Mo-Pac Expressway project, dated June 20, 1969, J. C. Dingwall, the Texas State Highway Engineer, purported to give the assurances required by 23 U.S.C. § 502 and IM 80–1–68, paragraph 5. These assurances tracked almost word for word the language contained in paragraph 5.[4] The letter furnished no specific information in any form concerning the particular relocation problems presented by the Mo-Pac Expressway project or any concrete plans to achieve compliance with the relocation requirements of the Act. The letter was accompanied by a copy of the Texas Highway Department's proposed Relocation Payment and Assistance Procedures, setting out the procedures to be followed on a state-wide basis in order to comply with federal relocation requirements. In reply to the letter of June 20th, the Division Engineer informed Dingwall by letter on August 19, 1968, that the relocation procedures had been approved by the Regional Federal Highway Administrator for interim use pending review in Washington. No mention was made of the paragraph 5(a) assurances also contained in the letter.

In written stipulations entered into by the parties on June 20, 1970, it is admitted that the Federal defendants received written assurances from the State defendants as described in paragraph 5(a)(1) through (5) of IM 80–1–68. However, it is conceded that the Federal Division Engineer responsible for supervising the Mo-Pac Expressway project has not approved any documentary assurances submitted to him by State defendants pursuant to paragraph 7(b) of IM 80–1–68.[5]

---

4. In pertinent part, the letter stated:
   The following assurances are given as outlined in paragraph 5a, IM 80–1–68:
   1. Relocation payments and services will be provided as set forth in paragraphs 6 through 10 of IM 80–1–68 to the extent outlined in Commission Minute 62135 and implementing instructions.

   2. In event housing available to persons without regard to race, color, religion or natural origin will not be available within a reasonable period of time prior to displacement as provided in paragraph 7 of IM 80–1–68, a detailed statement will be provided specifying the respects in which such assurance cannot be furnished, the extent to which such housing will be available and an estimate of the additional time within which such housing will become available to the extent that it can be reasonably accomplished.
   3. The public will be adequately informed of the relocation payments and services which will be available, as set forth in paragraph 12, IM 80–1–68.
   4. Assurance in regard to the 90 day notice was given in my letter dated September 3, 1968, and accepted by your letter of September 10, 1968.
   5. As set forth in the attached Administrative Order, our relocation program is considered realistic and adequate to provide orderly, timely and efficient relocation of displaced individuals and families to decent, safe and sanitary housing available to persons without regard to race, color, religion or national origin with minimum hardship on those affected.
   \* \* \* \* \*

5. Specifically, the stipulations stated that: "the Federal Division Engineer responsible for supervising the Mo-Pac Expressway Project \* \* \* has not approved any documentary submission to him by State defendants pursuant to paragraph 7b(1) of IM 80–1–68, which consisted of a written description of the methods and procedures by which the needs of every individual to be displaced by said Project would be evaluated and correlated with available decent, safe and sanitary housing at reasonable rents or prices and readily accessible to his place of employment; \* \* \* any documents submitted to him by State defendants pursuant to paragraph 7b(2) of IM 80–1–68, which consisted of written assurances of currently available comparable housing available to persons displaced by the Mo-Pac Expressway Project without regard to race, color, religion or national origin which is decent, safe and sanitary, including type of building, state of repair, number of rooms, needs of the person or family being displaced (based on standards outlined in paragraph 13 of IM 80–1–68), type of neighborhood, proximity of public transportation and commercial shopping areas, and distance to pertinent social institutions; \* \* \* any document submitted to him by State defendants in

The appellants argue that the assurances proffered by the State Highway Department failed to comply with the assurance requirements of 23 U.S.C. §§ 502 and 508 and IM 80–1–68 because of the absence of any factual showing of the State's ability to comply with the overall relocation requirements of the Act and the failure to relate the assurances specifically to the Mo-Pac Expressway project and to the relocation facilities of the City of Austin.[6] The appellants also argue that they were denied their constitutional right to the due process of the law because of DOT's failure to establish timely procedures to enforce the federal pre-displacement relocation assurances. On this basis, the appellants seek an injunction prohibiting further construction on the expressway project until the proper assurances are given and the ordering of affirmative action, if necessary, to provide the displacees with housing complying with the federal act, even if the State Highway Department would thereby be required to build new housing.

■ There is, however, a fatal infirmity in the appellants' case: all the individuals from the Clarksville community displaced by the Mo-Pac Expressway project have accepted relocation and thus are beyond the pale of whatever benefit proper assurances would have afforded, assuming *arguendo* that the proffered assurances were, in fact, legally insufficient. Consequently, any attempt at injunctive relief would require this court to undo what has, by the working of time and intervening events, escaped the power of the injunction. Declaratory relief would also be futile because intervening events have likewise transformed the nature of the controversy presented here into another potential dispute, not properly before this court, raising the issue of whether the individuals displaced were in fact relocated in accordance with the requirements of the Act. Cf. Triangle Improvement Council v. Ritchie, 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed.2d 61 (1971). It is our inescapable conclusion that the controversy regarding whether there was compliance with the predisplacement relocation assurance requirements of the 1968 Act has become moot. McKee & Company v. First National Bank of San Diego, 9 Cir., 1968, 397 F.2d 248; Bynum v. Burns, 8 Cir., 1967, 379 F.2d 229, 233; Flight Engineers' Internat'l. Ass'n v. Trans World Airlines, 8 Cir., 1962, 305 F.2d 675, 680, 681. See Powelton Civic Home Owners Ass'n v. Department of H. & U. Dev., supra, n. 6, 284 F.Supp. at 815; Roberts, "Highway Relocation Planning and Early Judicial Review," 7 Harv.J.Legis. 179 (1970).

It must be made clear, however, that by our silence on the merits of the issue

connection with the Mo-Pac Expressway Project pursuant to paragraph 7b(3) of IM 80–1–68, except that by letter of September 10, 1968, from Coy to Dingwall, the Division Engineer accepted the assurance of Dingwall given to him by letter of September 3, 1968, contained in paragraph (2) of such letter concerning 90 days' written notice to occupants * * *."

6. The appellants rely primarily on the plain language of the statutes and regulations involved. In addition, they rely heavily on the case of Powelton Civic Home Owners Ass'n v. Department of H. & U. Dev., E.D.Pa., 1968, 284 F.Supp. 809, dealing with the pre-displacement assurances required by 42 U.S.C. § 1455 in federally financed urban renewal projects, wherein it was stated:

* * * In determining the availability of satisfactory relocation facilities, the Secretary's inquiries will be directed towards the ascertainment of general statistical facts: what are the general conditions in the area housing market? what are the competing demands from other housing consumers? what are the general needs of the displaced families? At 829.

See also Scenic Hudson Preservation Conf. v. Federal Power Commission, 2 Cir., 1965, 354 F.2d 608, cert. den. Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L. Ed.2d 540, and Michigan Consolidated Gas Co. v. Federal Power Com'n., 108 D.C.App. 409, 283 F.2d 204 (1960), cert. den. Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas Co., 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227.

here before us, we express no opinion upon whether the Federal and State officials charged with supervision of the highway expressway project complied with the pre-displacement relocation assurance requirements of the 1968 Act.

Similarly, the more fundamental issue of whether the individuals displaced from the Clarksville community were relocated in compliance with the requirements of the 1968 Act, apart from whether adequate assurances were in fact given, was not before the district court below and cannot be decided on the record now before us. For the same reason, we cannot pass on the question of whether the Black and Mexican American persons displaced from Clarksville by the expressway project were relocated in a discriminatory manner in violation of their right to equal protection of the laws. The fact of discrimination by state action cannot be assumed; it must be proved as any other fact necessary to support a claim for relief. In the record before us there is nothing that would support any finding by the district court, had one been made, that any person displaced from Clarksville was denied the equal protection of the laws by receiving discriminatory relocation housing.

II.

As was noted earlier, a public hearing on the Mo-Pac Expressway project was held on February 6, 1968. The appellants contend that this hearing was inadequate in two respects: (1) that a second hearing dealing specifically with the design aspects of the project was required to have been held in accordance with a later amendment of the applicable statute and the regulations promulgated thereunder because final design approval had not been granted prior to the effective date of the amendment; and (2) that the 1968 hearing was inadequate even under the then existing statute and regulations because it was not held at a convenient location or at a time or place generally convenient for the persons affected by the proposed project.

A. Design Hearing.

Prior to August 23, 1968, Section 128 of Title 23, U.S.C. (1966) required that a State highway department submitting plans for a federal-aid highway project in an urban area certify to DOT that it had held public hearings or had afforded the opportunity for such hearings, and considered the economic effects of the project's location.[7] The 1968 amendment requires additional certification that the social and environmental effects of the proposed project have been considered, as well as the project's consistency with the goals and objectives of such urban planning as have been promulgated by the community.[8] DOT Policy and Procedure

---

7. 23 U.S.C. § 128(a) (1966) provides:
   Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic effects of such a location. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any ob-
   jections they may have to the proposed location of such highway.

8. 23 U.S.C. § 128, as amended, (Supp. 1971) provides:
   Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify

Memorandum 20–8, entitled "Public Hearing and Location Approval", issued January 4, 1969 (hereafter, PPM 20–8), sets out certain procedures and requirements to effectuate the hearing provisions of amended § 128. Paragraph 6(a) of PPM 20–8 requires that both a "corridor public hearing" and a "design public hearing" be held on federal-aid highway projects, such as the project here in question.[9] It is not disputed that a design hearing was not held on the Mo-Pac Expressway project.

PPM 20–8, paragraph 6(d) (2) provides that "[w]ith respect to those projects which have not received design approval:

(a) If design approval is not requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is required.

(b) If design approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is nevertheless required unless the division engineer finds that the hearing adequately dealt

with design issues relating to major design features."

The appellants rely strongly on the case of D. C. Federation of Civic Associations, Inc. v. Volpe, D.C.Cir., 434 F.2d 436 (1970), which held that a federal-aid highway project which had not received design approval prior to the 1968 amendment of Section 128 and the promulgation of PPM 20–8 was subject to the corridor/design hearing requirements set out in the regulations. On remand, the district court held that § 6(d) (2) required that a new design hearing be held before construction work on the project, which was then in the preliminary stages could proceed any further since no request for design approval within the meaning of the PPM was made within three years of the original hearings, held in 1964, nor was any design approval granted prior to the adoption of the PPM in January, 1969. D. C. Federation of Civic Associations v. Volpe, D.D.C., 1970, 316 F.Supp. 754, 785.

The appellees contend that design approval had been given by the Federal Bureau of Public Roads prior to the effective date of PPM 20–8. The record

to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

9. PPM 20–8, paragraph 6(a), provides:
Both a corridor public hearing and a design public hearing must be held, or an opportunity afforded for those hearings, with respect to each Federal-aid highway project that:
(1) Is on a new location; or
(2) Would have a substantially different social, economic or environmental effect; or
(3) Would essentially change the layout or function of connecting roads or streets.
\* \* \* \* \*
A "corridor public hearing" is defined as a hearing "held before the route location is approved and before the State highway department is committed to a specific

proposal \* \* \* to insure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal aid highway; and [affording] a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic and environmental effects of these alternate locations". PPM 20–8, Paragraph 4(a).
A "design public hearing" is defined as a hearing "held after the route location has been approved, but before the State highway department is committed to a specific design proposal \* \* \* to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and \* \* \* [affording] a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs". PPM 20–8, Paragraph 4(b).

indicates that the schematic layout for the project was submitted for approval in December of 1967 and that initial approval was granted, contingent upon four specified modifications, by letter from the Division Engineer to the State Highway Department dated July 22, 1968. Revised schematics were then submitted and approved contingently by letter on October 24, 1969, with one design modification required and upon the deferment of final approval of the design of one interchange pending further studies. It is stipulated that:

38. The revised design schematics for at least one of the eleven interchanges on the plan for the Mo-Pac Expressway between Town Lake and U. S. Route 183 were not complete as of the date of these stipulations.

\* \* \*

39. On October 24, 1969, Federal defendant Cary stated in writing to the Texas Highway Department that approval of revised schematic designs for portions of the Mo-Pac project located in and around Clarksville and located in and around U. S. 183 was contingent upon two factors: (1) Completion of additional studies to determine the most practical design for the U. S. 183 interchange. (2) Reduction of the width of the northbound structure over Enfield Road until the exact location of the on-ramp for the Crosstown Expressway is established. Subsequent to October 24, 1969, the Texas Highway Department eliminated from the design plan for the Mo-Pac Expressway project and accommodation for an interchange in or around Clarksville with the proposed Crosstown Expressway.

The appellants contend that while this contingent approval has been given, no *final* approval of the project design was given by the Bureau of Public Roads prior to the effective date of PPM 20–8, as required by D. C. Federation of Civic Associations, Inc. v. Volpe, supra, 434 F.2d at 436, n. 56, and the district court's interpretation thereof. 316 F.Supp. at 782. Agreeing with the proposition that

the design approval contemplated by PPM 20–8 is *final* approval, we feel that, although termed contingent, final design approval had been given the Mo-Pac Expressway project prior to the effective date of the PPM, except as to those design aspects specifically excluded from approval. Cf. D. C. Federation of Civic Associations, Inc. v. Volpe, supra, 434 F. 2d 462 (concurring opinion, Bazelon, C. J.). Indeed, any other result would lead to chaos. It has been well over a year since the design of the project was approved, contingent, as it turns out, only as to a deferred decision on the design of one interchange. Although the displacement of persons in the path of the project was enjoined for a short time, neither the actual construction nor any preparatory steps related to the construction process have been judicially halted. It would be inequitable to now enjoin the entire project, long after it is well on its way, in order to hold a hearing to reconsider decisions already made and acted upon in compliance with the requirements of the then existing law. Cf. Road Review League, Town of Bedford v. Boyd, S.D.N.Y., 1967, 270 F.Supp. 650, 664.

█ Since the record indicates that the design of the U. S. 183 interchange had not been approved as of the effective date of PPM 20–8, even though the initial request for design approval was made within three years of the 1968 hearing, the case must be remanded for the district court to order the Division Engineer of the Bureau of Public Roads to determine whether the 1968 hearing "adequately dealt with the design issues relating to the major design features" of the interchange, and, if he finds the 1968 hearing did not do so, order the Texas Highway Department to hold a public hearing regarding the design of the interchange in accordance with the requirements set out in PPM 20–8.

B. Adequacy of 1968 Hearing.

It is stipulated that the 1968 hearing was held at 10:00 A.M. on a working day at the Texas Highway Department's District 14 headquarters located at 1709

Interregional Highway in Travis County, Texas, outside the city limits of Austin. Appellants contend that this was neither "a convenient location" nor "a time or place generally convenient for persons affected by the proposed project", as required by the pre-amendment version of Section 128, supra, n. 7, and Policy and Procedure Memorandum 20–8 (1), issued June 16, 1959 (hereafter, the 1959 PPM). They contend further that the 1968 hearing failed to consider "the economic effects" of the proposed highway, as required by Section 128 and the 1959 PPM, particularly in failing to consider the problems of displacement and relocation. They also ·contend that the public notices of the hearing were inadequate.

■ While acknowledging the constitutional importance of public hearings prior to final administrative determination of highway location and design,[10] we do not feel that injunctive relief, either in the nature of ordering a new location hearing or halting construction until a new hearing is held, would, at this stage, effectuate the rights or protect the interests of the appellants or those they represent, if, indeed, the hearing was to be held inadequate as a matter of law. Although we in no way condone hearings of any sort conducted in a legally deficient manner, we recognize that there must come a point in time when even the most grievous wrong is sadly beyond the power of equity to rectify. Here the appellants, persons displaced from the Clarksville community by an expressway project, have been relocated and their houses demolished, commitments have been entered into by the City of Austin, the State of Texas, and the federal government among themselves and third parties, and construction is proceeding. The equities of the case have become multifarious and more sharply antagonistic. Against the rights and interests of the appellants must be balanced the diverse interests that have now matured. Many factors, including existing contractual commitments, work completed, the extreme difficulty or impos-

sibility of now relocating the right-of-way or altering the design, the public's need for rapid and safe transportation, as well as the impossibility of returning the appellants to the *status quo ante* even if a hearing were ordered, all mitigate heavily against the intervention of equity, if it were warranted at an earlier stage of the project.

The judgment of the district court granting summary judgment is affirmed in all things except with regard to the need for a design hearing limited to the yet to be approved design for the U. S. 183 interchange, where it is reversed and remanded for proceedings not inconsistent herewith.

Affirmed in part; reversed and remanded in part.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

**10.** See D. C. Federation of Civic Associations, Inc. v. Volpe, supra, 434 F.2d at 441, 442.