537 F.2d 79
 9 ERC 1245, 6 Envtl. L. Rep. 20,710
 LOUISIANA ENVIRONMENTAL SOCIETY, INC., et al., Plaintiffs-Appellants,
v.
William T. COLEMAN, Jr., Secretary, Department of
Transportation, andDepartment of Highways, State
of Louisiana, Defendants-Appellees.
 No. 76-1686.
 United States Court of Appeals,
Fifth Circuit.
 July 30, 1976.
 
 Billy R. Pesnell, Shreveport, La., for plaintiffs-appellants.
 Donald E. Walter, U. S. Atty., Shreveport, La., Jean Rogers, Regional Counsel, Federal Highway Administration, Ft. Worth, Tex., for Dept. of Transportation.
 Norman L. Sisson, Baton Rouge, La., for Dept. of Hwy.
 Sharon P. Frazier, Robert J. Jones, Asst. Attys. Gen., Baton Rouge, La., for State defendant-appellee.
 Larry G. Gutterridge, George R. Hyde, Atty., Peter R. Taft, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for Federal defendant-appellee.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before CLARK, GEE and TJOFLAT, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Once again this court must resolve whether the Louisiana Department of Highways (Highway Department) and the Secretary of the Department of Transportation have adequately complied with the various statutes which govern their attempt to bridge a significant recreational area, Cross Lake, as part of a highway construction project. All operative facts concerning this litigation are detailed in our previous opinion affirming the denial of a preliminary injunction, Louisiana Environmental Society, Inc. v. Coleman, 524 F.2d 930 (5th Cir. 1975), and in the lower court opinion denying the petition for a permanent injunction. Louisiana Environmental Society, Inc. v. Brinegar, 407 F.Supp. 1309 (W.D.La.1976). The present appeal is from this denial of the permanent injunction.
 
 
 2
 Louisiana Environmental Society claims four major failures by the Secretary and the Highway Department in their effort to comply with statutory dictates any one of which might require reversal of the denial of the permanent injunction: (1) the Secretary and Highway Department, for numerous reasons,[1] did not comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, et seq.; (2) the proposed I-220 bypass is not based on a continuing comprehensive transportation planning process as required by 23 U.S.C. § 134; (3) the § 4(f) determination required by 23 U.S.C. § 138 and 49 U.S.C. § 1653(f) is invalid; and (4) public hearings were not held in accordance with 23 U.S.C. § 128(a) and Federal Highway Administration Policy and Procedure Memorandum (PPM) 20-8.
 
 
 3
 The district court concluded that the Environmental Impact Statement was adequate and the Secretary and Highway Department had complied completely with NEPA. The court also found that the comprehensive planning process was adequate. On the basis of the district court opinion on these issues, we affirm its decision. However, the § 4(f) determination is invalid and the findings of fact made are insufficient to justify the conclusion that an additional public hearing is not required. We reverse this portion of the support for the injunction order, and therefore vacate the denial of injunctive relief and remand with directions to enter a preliminary injunction restraining proceedings to construct a bridge across Cross Lake until the Secretary has complied with § 4(f) and an additional public hearing is held or sufficient facts have been found to justify the denial of any new hearings.
 
 I. Section 4(f) Determination
 
 4
 Section 4(f) is a legislative command that no significant recreational area be used for a federal highway project if (1) any feasible and prudent alternative exists, and then, only if (2) the project includes all possible planning to minimize harm to the recreational area.[2] The focus of the Secretary (and the court) on the reasonableness of the Secretary's subsection (1) conclusion that there was no feasible and prudent alternative to the bridging of Cross Lake has been too myopic. Consideration must be given to the various alternatives which would minimize harm to the recreational area.
 
 
 5
 Eight alternatives, including the adopted route, have been discussed during the pendency of this highway planning and litigation process. Their location, relationship and effects can best be understood by reference to the rough sketch below.[3] Theadopted route bridges Cross Lake at one of its widest and deepest points. Alternate A is west of the adopted route but still requires bridging the lake. Alternate routes B and B-1 are similar to but slightly to the west of the adopted route. Alternate C traverses the eastern side of the lake but crosses two lake pockets. Alternate D sweeps around the lake to the west. These alternative routings and the alternative of not building the bypass were before the Secretary when he determined that all alternates were feasible but none were prudent. Although the alternate route designated as C-modified was not specifically considered, the Secretary recognized that several problems with alternate C could be solved by making the alterations which are embodied in alternate C-modified. Thus this alternate was effectively considered by the Secretary also.
 
 
 6
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 7
 In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136, the full significance of the statutory prohibitions against the use of parklands is made especially clear. As interpreted in Overton Park, the statute requires that parklands cannot be used unless all alternatives to their use are infeasible and imprudent. An alternative route which does not use the park cannot be found by the Secretary to be imprudent "unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes."
 
 
 8
 Distilling the factual background of the Cross Lake bridge, the § 4(f) prudence standard involved in Overton Park, and the appropriate administrative standard of review, the district court condensed three questions, an affirmative answer to any of which would require dismissing the plaintiffs' attack on the Secretary's § 4(f) determination: (1) "Could (the Secretary) have reasonably believed that there was no substantial taking (of a recreational area)?" (2) Could the Secretary have reasonably believed in this case that there were truly unusual factors?" (3) "Could (the Secretary) have reasonably believed that the alternate routes presented unique problems?" The lower court went on to find an affirmative answer was required to each of the three questions.
 
 Question 1. Substantial Taking
 
 9
 We specifically reject the lower court's first inquiry as legally erroneous. This is traceable to a mistaken understanding of the impact of Overton Park. The Court spoke there of the highway project as one destroying parkland. However, the Court's strict definition of § 4(f) prudence was not limited to factual situations involving severe takings or destruction of parkland. Rather, the spirit of Overton Park is clearly to the effect that the statute is to be read broadly to protect greenlands. Neither did Overton Park enunciate any sort of substantial taking threshold for the applicability of § 4(f). The statute explicitly states that it is applicable whenever parkland will be "used for a highway project."
 
 
 10
 The proposed bridging certainly "uses" Cross Lake and both § 4(f) and Overton Park's overlay are applicable. Congress articulated in § 4(f) a disparate weighting against the use of parkland for highway projects. It said, don't use greenlands, but if you must do so, be practical and cut harm to the minimum. It did so in recognition of the fact that it is always easier to build highways through publicly owned parks because people and their homes, businesses, schools and churches will not have to be displaced and its acquisition costs little or nothing. This thumb-on-the-scale approach is required whenever the parkland is to be used. If courts were to interpret this section to permit an initial appraisal of whether the use was substantial, it would infuse consideration of elements (such as the degree of harm to the park, animal life, environment, etc.) which Congress did not want considered when it said, if there is another way, take it. Any park use, regardless of its degree, invokes § 4(f).Question 2. Unique Problems
 
 
 11
 In reviewing the evidence to determine whether unique factors were present, the court found that the rejection of the approved route across Cross Lake would necessitate a delay of at least 10 years before an alternate route could be approved. The court found this fact "unique within the meaning of Overton Park." We reject this conclusion. Most statutory violations expose the offender to sanction. If time is the penalty, it cannot be turned into an exception which justifies noncompliance. Under such reasoning, the exception becomes greater than the statute. We pretermit review of the factual ten-years-to-comply conclusion, because it cannot be a fact which justifies noncompliance.
 
 Question 3. Truly Unusual Factors
 
 12
 The district court examined the consequences of each of the seven alternatives and concluded that the Secretary could have reasonably concluded that truly unusual factors would accompany the building of each alternate and the no-build alternative. The court, however, used an improper decisional approach. Section 4(f)(1) requires that each "alternative to the use" of the parkland must be found to be either infeasible or imprudent before the Secretary can approve the use of parkland. The Secretary rejected alternates A, B, B-1, C and C-modified and the no-build alternative because they were feasible but not prudent; however, only alternate route D and the no-build decision were "alternatives to the use of the" recreational area. As the sketch above shows, all other alternate routes use Cross Lake. Both alternate D and the no-build alternative were imprudent because they failed to fulfill the needed purpose of a circumferential highway route. Alternate D sweeps too far to the west and no-build means no by-pass.
 
 
 13
 The Society claims that alternate C-modified is prudent and, therefore, the Secretary's determination is unreasonable. But, the prudence of C-modified is irrelevant as to a subsection (1) determination because C-modified is not an "alternative to the use" of Cross Lake. The Society argues that C-modified only involves a de minimis taking of the lake and that the pockets of water actually crossed by C-modified are not themselves significant recreational areas. Both of these arguments involve the same logic used by the district court to conclude that the adopted route was not a substantial taking of parkland. We reject the Society's arguments for the same reason that we rejected the court's conclusion. An alternate route which uses any part of a park is not an alternative to use of the park. Finish Allatoona's Interstate Right, Inc. v. Brinegar, 484 F.2d 638 (5th Cir. 1973); Citizens to Preserve Foster Park v. Volpe, 466 F.2d 991 (7th Cir. 1972). In addition to actual physical use of the recreational area, both alternates C and C-modified would block the view of the lake from persons owning homes along the eastern shore or seeking to enjoy the view from that area. Other courts have held that a highway which either encircles or even comes very close to parklands, and thereby blocks the view or causes noise, air pollution, etc., is in fact use of the area even though there is no physical intrusion on the parklands. Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972); Conservation Society v. Secretary of Transportation, 362 F.Supp. 627 (D.Ver.1973), aff'd 508 F.2d 927 (2d Cir. 1974).
 
 
 14
 Since the two alternatives which do not use Cross Lake could reasonably have been determined imprudent, the denial of the injunction on this ground should be affirmed. But, this is only the first half of the § 4(f) inquiry. Section 4(f)(2) requires that all possible planning to minimize harm to the parkland must be accomplished before the Secretary can approve the parkland route. The relocation of a highway through another portion of a recreational area must be considered as a means of minimizing harm to the area. D.C. Federation v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1972); see Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693 (2d Cir. 1972); Brooks v. Volpe, 380 F.Supp. 1287 (W.D.Wash.1974). This requires a simple balancing process which would total the harm to the recreational area of each alternate route and select the route which does the least total harm. The Secretary never articulated any such balancing of the relative harms to the lake from the various routes which went through different portions of the recreational area. In fact, it is entirely clear that each of these routes was weighed only as an "alternative" to the use of the lake and was examined only under the feasible and prudent standard.
 
 
 15
 Since the matter must go back for the Secretary's further consideration, it is appropriate to comment here upon the principles which should govern that process. The significant difference between the § 4(f) subsection (1) and (2) assays is that considerations which might make an alternate imprudent (such as displacement of persons and businesses or a Title VI[4] problem) are simply not relevant to determining whether a different path would minimize harm to the recreational value of Cross Lake. Therefore, the record which was before the Secretary leads to the conclusion that the Secretary did not make the requisite testing of the various routes to determine how to keep harm to the lake to a minimum. This balancing process is required by the statute to be made by the Secretary in the first instance.[5]
 
 
 16
 The duty to consider alternate routes which use the lake grows from the requirement that all possible planning must be done to minimize harm. Therefore, if an alternate would not minimize harm it would not have to be accepted in lieu of the suggested or adopted route. The Secretary would be free to choose between equal damage alternatives. The § 4(f) statement indicates that the amount of harm which would be done to the lake by alternates B and B-1 and the adopted route are similar. If the Secretary's review should result in concluding that the harm is not only similar but substantially equal, the Secretary could freely choose between these suggested routes.
 
 
 17
 We do not imply that any alternate route which will do less harm to the recreational area than the adopted route must be accepted. Although there is no express feasible and prudent exception to subsection (2), the act clearly implies that one is present. Since the statute allows rejection of a route which completely by-passes the recreational area if it is infeasible or imprudent, it is totally reasonable to assume that Congress intended that a route which used the recreational area but had a less adverse impact could be rejected for the same reason. What we stress is that the reasoning processes must be kept entirely separate. A route may be rejected because it does not minimize harm only for reasons relevant to the quantum of harm which will be done to the recreational area. If it does minimize harm, a route may be rejected only for truly unusual factors other than its effect on the recreational area. Specifically, the § 4(f) statement here concludes that alternate A, which reasonably could be found to do less harm to Cross Lake than the adopted route, could still be rejected for the same reason as alternate D imprudence because it also sweeps too far to the west to serve the purposes of an urban circumferential highway. This finding of imprudence is reasonable and therefore is affirmed.
 
 
 18
 Alternates C and C-modified, however, must be carefully considered. They harm the lake in that they cut off its view by residents and visitors on the eastern side of the lake while the adopted route creates minimal visual distraction. Although C and C-modified do not interfere with sailing or skiing as does the adopted route, they are closer to the Shreveport water intake valve. We do not reach whether the Secretary could have reasonably concluded that C, C-modified, or even A, B, or B-1 did less harm to Cross Lake than the adopted route because the Secretary did not perform the balancing of relevant considerations which we hold § 4(f)(2) requires. Therefore, we remand to the district court with instructions to enjoin further construction pending the Secretary's compliance with § 4(f).
 
 
 19
 The Secretary concluded that B, B-1 and C and C-modified were not prudent alternatives. Under the proper § 4(f)(2) analysis this could prevent the acceptance of one of these alternatives even if it was found to be less harmful. The district court concluded that the Secretary's finding of imprudence was reasonable. Affirmance of this conclusion would make our requirement that the Secretary reach the minimization of harm issue a futile one. But, stripped to the bare reasons both before the Secretary at the time the § 4(f) determination was made and those involving only factors other than those showing actual harm to the lake, a conclusion that these alternatives are imprudent appears perilously close to the line of reasonableness. Routes B and B-1 are very similar to the adopted route and no truly unusual factors have been shown to justify the finding that they are imprudent. C and C-modified require displacements which cannot be found to be of an extraordinary magnitude.[6] Unless these alternates are found not to minimize harm to the lake or unless other considerations are enunciated by the Secretary which show imprudence, the Secretary could not reasonably give his § 4(f) approval to the bridging of Cross Lake along the route adopted.[7]
 
 II. Public Hearings
 
 20
 A public hearing was held on December 15, 1964 concerning this entire by-pass highway project (I-220) under the then applicable statutes and regulations governing public hearings for federal-state highway projects. A subsequent decision to relocate the east terminus of the bypass caused a second hearing to be held on May 2, 1967 also under the statutes and regulations in effect at that time.
 
 
 21
 The Society argues that the hearings as held under these statutes were inadequate and, therefore, new hearings should be held. Its attack asserts that a statement was made by a hearing official that no questions would be answered. The Highway Department responds that there were in fact questions and answers at the hearing. The district court concluded that a fair and open hearing was held. We affirm this conclusion.
 
 
 22
 Effective August 23, 1968, 23 U.S.C. § 128(a) was amended to require that public hearings on highway projects consider the social and environmental effects of planned highway projects in addition to previously required economic effects. On January 4, 1969, the Department of Transportation adopted an implementing regulation designated PPM 20-8,[8] which required two public hearings for each highway project: a location hearing prior to location approval[9] and a design hearing prior to design approval. The Society argues that the new statute and implementing regulation should apply to ongoing projects. The district court rejected this contention concluding that the new statute and regulation should not be retroactively applied. The question, however, is not retroactivity; it is whether the statute and regulation apply to ongoing projects.
 
 
 23
 In Concerned Citizens for the Preservation of Clarksville v. Volpe, 445 F.2d 486 (5th Cir. 1971), we held that both the statute and its implementing regulation PPM 20-8 do apply to ongoing projects. In fact, § 6(d)(2) of PPM 20-8 provides the mechanism for determining when the regulation will not be found to require an additional design hearing. This section of PPM 20-8 exempts all projects from additional hearings if they have received "design approval" prior to the effective date of the regulation (January 4, 1969). It further provides that, if they have not received such design approval, the new hearing requirements still may not be applicable if design approval has been requested by the state within 3 years of the date of the hearing given under the old statute and applicable regulations. This previous hearing, however, must have been found by the division engineer to have adequately dealt with the design issues relating to the major design features of the project. The key significant dates which govern the applicability of PPM 20-8 are the dates on which design approval was given and upon which the design approval request was made.
 
 
 24
 The major problem for the instant hearing procedures is that prior to January 4, 1969 there was no specific "design approval" process. In other words, all of the cases dealing with this issue have resulted in an examination of the record to determine when "design approval" occurred as the term is vaguely defined in PPM 20-8.[10] In Concerned Citizens we held that "design approval contemplated by PPM 20-8 is final approval . . .." It is impossible to determine from the record before us when final "design approval" was given or requested. The federal and state defendants in this case point to the line and grade approval as being the design approval contemplated by the regulation. This approval took place between February 28, 1966 and May 15, 1968. In addition to the patent ambiguity in suggesting use of a 15 month period instead of a date, it is clear from the record that some design changes were made after this period, such as the claimed significant widening of bridge spans.
 
 
 25
 On remand the lower court must determine when design approval was given by the federal government; or if it was not given prior to the effective date of this regulation, the lower court must determine whether design approval was requested within 3 years of the original hearing. To fulfill this task the court must decide what is "final design approval" within the facts of this particular case. The design plans whose approval were pointed to as the final design approval in Concerned Citizens were obviously very complete design plans. Except for providing these general guidelines, Concerned Citizens does not answer our questions here. However, the case did adopt the standard enunciated in D.C. Federation of Civil Associations, Inc. v. Volpe, 148 U.S.App.D.C. 267, 434 F.2d 436 (1970), as it was further refined in D.C. Federation of Civil Associations, Inc. v. Volpe, 316 F.Supp. 754 (1970). The lower court in the D.C. Federation case required the proof of a date it could confidently point to as the date "final design approval" had been given. Absent the finding of that kind of date, it implied that the "plans, specification and estimates" (P.S. & E.) approval date would be considered to be the final design approval date. other circuits which have dealt with this problem have also used the P.S. & E. date as the date for final design approval.[11] We expressly decline to hold that final design approval cannot take place until P.S. & E. approval has been given. We do hold that unless the lower court can confidently point to a date when final design approval for the sections of the bypass involved in this litigation were approved, the P.S. & E. approval date must be used.
 
 
 26
 If the district court should determine that final design approval was not given before January 4, 1969, but that a request for final design approval was made within 3 years of the original hearing, the court must then find that the division engineer's certification that the original hearing dealt with major design requirements was a reasonable certification.[12]
 
 
 27
 Should the court determine that the requirements of § 6(d)(2) of PPM 20-8 have been met so that no additional design hearing is now required, the court must further determine that no subsequent changes in the location or the design have occurred which reactivate the requirement for an additional hearing. Although the trial court dismissed the relocation of the west terminus issue because it was in the original corridor, that is not the applicable test under the newly adopted PPM 20-8. See § 6(a), PPM 20-8. The court must determine whether the relocation of the west terminus, or any other changes in location or design, "would have a substantially different social, economic or environmental effect." If they would, a new hearing must be held under PPM 20-8. Therefore, our remand of this cause is with instructions that the district court's injunction against any further work on the Cross Lake bridge be further conditioned to await the court's factual determination that § 6(d)(2) and § 6(a) of PPM 20-8 do not require that any new public hearings on this project be held, or until any new hearings required by these sections have in fact been held. Should the lower court determine that the finding of the necessary facts to justify a § 6(d)(2) and § 6(a) finding that no further hearings must be held would result in a longer delay in the completion of this project than would ordering and holding additional hearings, the court may at its discretion follow the latter procedure.
 
 
 28
 AFFIRMED IN PART, REVERSED AND REMANDED.
 
 
 
 [1]
 The Society claims the Highway Department and the Secretary failed to use a systematic interdisciplinary approach to compiling the Environmental Impact Statement; that they did not fully disclose the environmental impact of and alternatives to the project; that they did not study, develop and describe appropriate alternatives to the project; the draft statement of the Impact Statement was inadequate and the final Impact Statement and supplement essentially constituted a draft statement which was never circulated; and the comments of the Council on Environmental Quality were not included with the proposal through the agency review process
 
 
 [2]
 Preservation of parklands:
 It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.
 23 U.S.C. § 138; see 49 U.S.C. § 1653(f).
 
 
 [3]
 
 
 
 [4]
 In concluding that the Secretary's rejection of C and C-modified was reasonable the lower court considered the possibility of a violation of Title VI of the Civil Rights Act. See 49 C.F.R. Part 21. The record before the Secretary did not even mention the problem of splitting black and white neighborhoods. This post hoc rationalization cannot be the basis for determining that the Secretary's original decision made without any hint of a Title VI concern was reasonable. See Union Electric Co. v. EPA, --- U.S. ----, 96 S.Ct. 2518, 48 L.Ed.2d ----, 44 U.S.L.W. 5060 (1976)
 
 
 [5]
 The statute reads: "the Secretary shall not approve any . . . project . . . unless . . . the program includes all possible planning to minimize harm to (the) recreational area . . . ." 23 U.S.C. § 138(2). Pennsylvania Env. Council, Inc. v. Bartlett, 454 F.2d 613 (3d Cir. 1971); cf. Union Electric Co. v. EPA, --- U.S. ----, 96 S.Ct. 2518, 48 L.Ed.2d ----, 44 U.S.L.W. 5060 (1976); Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 (5th Cir. 1973); Named Ind. Members of San Antonio Conservation Soc. v. Texas Hy. Dept., 446 F.2d 1013 (5th Cir. 1971)
 
 
 [6]
 C-modified would require displacing 120 single dwellings, 100 single apartment units (1 apartment project); 900 persons, 7 businesses, 1 church and 1 lodge. C would require displacing 377 single families, 1508 persons, 21 businesses, and 2 churches
 
 
 [7]
 Although the society raises other minimization-of-harm issues they are entirely factual and the district court's factual findings are not clearly erroneous
 
 
 [8]
 The PPM regulation can be found as Appendix A to 23 C.F.R. Part 1 (1972). The PPM involved here has since become a departmental regulation and is codified at 23 C.F.R. § 790 et seq. (1976)
 
 
 [9]
 The Society does not argue that PPM 20-8 requires a new location hearing except insofar as one is required by § 6(a) because of changes made in the location of the project, discussed infra
 
 
 [10]
 E. g., Concerned Citizens for the Preservation of Clarksville v. Volpe, 445 F.2d 486 (5th Cir. 1971); Wildlife Preserves, Inc. v. Volpe, 443 F.2d 1273, 1277 (3d Cir. 1971); D.C. Federation of Civil Ass'ns, Inc., v. Volpe, 148 U.S.App.D.C. 267, 434 F.2d 436 (1970); see Keith v. California Highway Comm'n, 506 F.2d 696 (9th Cir. 1974) (en banc)
 
 
 [11]
 Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693 (2d Cir. 1972); see Latham v. Brinegar, 506 F.2d 677 (9th Cir. 1974) (en banc)
 
 
 [12]
 The alleged affidavit by the assistant division engineer stating that no design features were discussed at the original hearing could prove to be a distinct problem to any such finding