772 F.2d 700
 23 ERC 1663, 15 Envtl. L. Rep. 21,082
 DRUID HILLS CIVIC ASSOCIATION, INC., et al., Plaintiffs-Appellants,
v.
The FEDERAL HIGHWAY ADMINISTRATION, et al., Defendants-Appellees.
NATIONAL TRUST FOR HISTORIC PRESERVATION in the United
States, Plaintiff- Appellant,
v.
FEDERAL HIGHWAY ADMINISTRATION, et al., Defendants-Appellees.
 Nos. 84-8894, 84-8924.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 16, 1985.
Rehearing and Rehearing En Banc Denied Oct. 28, 1985.
 
 David F. Walbert, Atlanta, Ga., Irwin Goldbloom, Washington, D.C., Elizabeth S. Merritt, Asst. Gen. Counsel, Harrison B. Wetherill, Jr., Washington, D.C., for appellant.
 Roland Matson, Sr., Asst. Atty. Gen., Terry Adamson, William Boone, Asst. U.S. Atty., Atlanta, Ga., for appellee.
 Mary Aunita Prebula, Terrence B. Adamson, Atlanta, Ga., for amicus curiae.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before HENDERSON and HATCHETT, Circuit Judges, and ALLGOOD*, District Judge.
 HENDERSON, Circuit Judge:
 
 
 1
 Druid Hills Civic Association, Inc., et al., in No. 84-8894 and National Trust For Historic Preservation in the United States in No. 84-8924 appeal the November 14, 1984 order of the United States District Court for the Northern District of Georgia denying their motions to enjoin construction of the Presidential Parkway (Parkway), a proposed 2.4 mile highway running east from the I-75/I-85 stub in downtown Atlanta to Ponce de Leon Avenue, an east-west arterial that is part of the Olmsted Park network in Atlanta's Druid Hills Historic District. On appeal, the appellants contend that the district court erred in finding that the named appellees complied with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Secs. 4321-4347 (1982), section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Sec. 303 (1982),[1] and section 18 of the Federal-Aid Highway Act of 1968, 23 U.S.C. Sec. 138 (1982).[2]
 
 FACTS AND HISTORICAL BACKGROUND[3]
 
 2
 For a better understanding of the current litigation, it is necessary to detail the history of the tract comprising the proposed Parkway. In the late 1960s and early 1970s, the Georgia Department of Transportation (GDOT) acquired approximately 219 acres as right-of-way for two multi-lane highways, one oriented north-south (I-485) and one extending east-west (Stone Mountain Tollway). The land, known locally as the Great Park, was cleared of dwellings and other structures and has been vacant ever since. In 1971, the United States District Court for the Northern District of Georgia enjoined construction of I-485 pending completion of an environmental impact statement (EIS) by the GDOT and the Federal Highway Administration (FHWA).[4] The GDOT prepared an EIS which was approved by the FHWA. The Secretary of the United States Department of Transportation (USDOT) nevertheless rejected the EIS in 1973 because it did not satisfy the requirements of section 4(f).
 
 
 3
 As a result of strong opposition to the Stone Mountain Tollway, Governor Jimmy Carter appointed a commission to examine the project and make recommendations. The commission recommended against building the Tollway until an assessment could be made on the effect of the impending construction of the MARTA[5] east rail line. Governor Carter accepted the commission's recommendation in December, 1972.
 
 
 4
 In 1973, the City of Atlanta withdrew its support for I-485 and the Atlanta Regional Commission (ARC) deleted the project from its Regional Transportation Plan in 1974. The State Transportation Board removed I-485 from the interstate highway system plan in 1974, which action was approved by the FHWA in 1975. In 1977, the GDOT began to dispose of all I-485 properties north of St. Charles Avenue but retained all the right-of-way south of that point for future transportation improvements in the east-west corridor.
 
 
 5
 Over the succeeding years, numerous alternatives for the use of the Great Park were developed. In 1974, Atlanta Mayor Maynard Jackson proposed the "Great Park" concept, a plan that included a variety of recreational and cultural facilities. In 1975, the City of Atlanta retained Arkhora Associates to prepare a reuse planning study for the Great Park. Arkhora's conceptual plan advocated a passive open space consisting of recreation areas, cultural facilities and housing. To meet transportation needs, the Arkhora proposal recommended that the I-75/I-85 stub be connected to DeKalb Avenue. The GDOT opposed the recommended action because it did not use the existing right-of-way to meet transportation needs and thereby failed to address the legal consequences of using the land for a non-transportation purpose. In 1977, the ARC adopted the Decatur Parkway Connector and Decatur Parkway, a road connecting the I-75/I-85 stub to an improved DeKalb Avenue, as part of its Regional Transportation Plan.
 
 
 6
 Atlanta Great Park Planning, Inc. (AGPP), a public nonprofit corporation, was formed in 1975 to study and plan for reuse of the property. AGPP's board of directors included representatives of ten neighborhoods, the Cities of Atlanta and Decatur, DeKalb County and the State of Georgia. A report published in 1977 acknowledged that the Great Park could serve not only as a major recreational area but also as a stimulus for economic development and cultural revitalization but withheld recommendation pending further study. In 1978, AGPP retained H. Randall Roark to study housing opportunities in the right-of-way. In addition to its housing proposals, Roark's study, published in 1979, adopted the transportation, open space and economic development recommendations contained in the Arkhora plan and the AGPP's 1977 report. The GDOT did not support the Roark plan for the same reasons that it opposed the earlier Arkhora proposal.
 
 
 7
 In 1978, the GDOT retained Evan L. Marbut and Associates, Inc. to prepare a park and road development project for the area. The Marbut Plan consisted of four-lane north-south and east-west roadways through the existing right-of-way, with the east-west road terminating at Moreland Avenue. Remaining right-of-way was to be developed as a park. The GDOT approved the plan, but the City of Atlanta and AGPP opposed it because it was excessively oriented to transportation.
 
 
 8
 John C. Portman, Jr. developed a land use plan for the Great Park in 1979 at the request of Governor George Busbee. Alan M. Voorhees & Associates, a transportation planning firm retained by Portman, recommended that the I-75/I-85 stub be connected to DeKalb Avenue by way of a tunnel. The plan also called for housing units and cultural, recreational and open space uses, including the proposed Carter Presidential Library.
 
 
 9
 In 1980, the Georgia General Assembly created the Great Park Authority to examine the various proposals and to develop a master plan for use of the property. The Great Park Authority retained Howard, Needles, Tammen & Bergendoff for transportation advice. The authority report presented to the 1981 General Assembly incorporated the firm's recommendation that the I-75/I-85 stub be connected to DeKalb Avenue along one of three proposed connecting routes and also included a park and housing facilities. The General Assembly took no specific action on this proposition.
 
 
 10
 The current design came into existence in the early 1980s. After leaving office in 1981, President Jimmy Carter began to formulate plans for a presidential library, museum and policy center (the Complex). President Carter regarded the Great Park property as an ideal location for the Complex because of its proximity to the central business district and metropolitan Atlanta universities, its relative seclusion and its accessibility to the interstate highway network.
 
 
 11
 In 1981, Andrew Young sought election as mayor of Atlanta. He ran in part on a platform of opposition to any roadway through the Great Park. After his election, Mayor Young reversed his position and in 1982 supported the so-called Mayor's Plan, the basic proposal sought to be enjoined in this litigation. The Mayor's Plan includes the Jimmy Carter Complex, a thirty-acre park surrounding the Complex, and a 2.4 mile highway consisting of a pair of two-lane roadways, one eastbound and one westbound, which circumscribe the Complex and park. In addition, the City of Atlanta is developing a housing plan for use of the remaining acreage. The Complex and roadside park would be located on existing right-of-way but further land acquisition would be necessary to build the highway.
 
 
 12
 Throughout the first half of 1982, the Mayor's office presented the plan to the Great Park Authority, the ARC, various neighborhood organizations, neighborhoods and concerned citizens. On July 6, 1982, the Atlanta City Council approved the Parkway plan by a vote of ten to nine. The plan was then analyzed by the ARC to determine if it should become part of the Regional Transportation Plan. In September, 1982, the ARC voted to amend its Regional Transportation Plan by replacing the proposed Decatur Parkway Connector and the Decatur Parkway with the Presidential Parkway. The ARC nonetheless acknowledged that the Decatur Parkway provided better traffic distribution by encouraging alternative routing.
 
 
 13
 In August, 1982, the FHWA placed a notice of intent to prepare an EIS in the Federal Register. On April 21, 1983, the FHWA, the lead agency for the Parkway project, signed the draft EIS. Approximately 1,000 copies of the draft statement were distributed to agencies, organizations and individuals. The draft EIS allocated four pages to a discussion of the building of the Parkway, but only two sentences to the alternative of not building it. Other alternatives, including previous plans for the area, a road extending only to the presidential library, a road terminating at Moreland Avenue, intersection improvements on existing streets, a two-lane Parkway and traffic improvements in the Ponce de Leon Avenue/Scott Boulevard corridor were discussed in four pages of text. Additional discussion of alternatives, including the proposed Decatur Parkway, was incorporated into the section addressing impacts on properties protected by section 4(f).
 
 
 14
 The GDOT and the FHWA conducted three informal public information meetings between May 31 and June 2, 1983 in neighborhoods adjacent to the project. Court reporters were available to transcribe comments. A fourth public information meeting was held at the Atlanta Civic Center on June 7, 1983. A public hearing consisting of a formal presentation followed by a public comment session was held later that evening. Court reporters were available in the lobby and in the auditorium to receive oral and written comments. Approximately 1,500 to 3,000 people attended the hearing.
 
 
 15
 Several federal agencies commented on the draft EIS, including the Department of the Interior (DOI), the Environmental Protection Agency (EPA), the General Services Administration and the USDOT. DOI first recommended that the final EIS give consideration to whether the proposed Parkway would meet transportation needs. The comments noted that it was not clear that termination of the Parkway at Ponce de Leon Avenue, an east-west arterial, would substantially relieve traffic congestion and provide for future transportation needs in the east-west corridor. In addition, the DOI stated that discussion of alternatives in the draft EIS was inadequate and recommended that the final statement contain a more extensive discourse of the no-build and Moreland Avenue termination alternatives. Given these deficiencies, the DOI felt that the draft EIS failed to adequately address section 4(f) considerations. The EPA found that the draft statement did not adequately evaluate the impact on air quality. The USDOT took the position that the draft EIS adequately addressed the effects of the project and measures to minimize harm. The department's comments further stated, however, that the draft EIS did not contain sufficient information to support a determination that there was no feasible and prudent alternative to the use of lands protected by section 4(f). Furthermore, the draft statement did not demonstrate a need for the Parkway as opposed to improvements to existing facilities. Therefore, the USDOT suggested a more thorough investigation of the Decatur Parkway alternative. The department concluded that it appeared that the proposed project would aggravate, rather than alleviate, traffic conditions on Ponce de Leon Avenue. The FHWA and the GDOT held meetings with the various agencies to evaluate their comments.
 
 
 16
 On August 4, 1983, ten days after the expiration of the period for comment on the draft EIS, the GDOT made the decision to proceed with preparation of the final EIS around the build, i.e., Parkway, option. The GDOT and FHWA also began preparation of a Preliminary Case Report (PCR) pursuant to section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. Sec. 470f, and 36 C.F.R. Sec. 800 to evaluate the impact of the project on historic and archaeological resources. The PCR was forwarded to the Georgia Department of Natural Resources on October 25, 1983 and to the United States Advisory Council on Historic Preservation (ACHP) on November 3, 1983. Copies of the PCR were made available to the public for comment.[6]
 
 
 17
 After a review of this preliminary report, the ACHP recommended that the GDOT and FHWA give further consideration to the Moreland Avenue termination alternative in conjunction with other transportation improvements. The FHWA responded that the Moreland Avenue alternative and others had been adequately considered but were not feasible or prudent. The chairman of the ACHP referred the matter to the full Council for consideration at a public hearing in Atlanta on February 27, 1984. Council members heard from witnesses and made an on-site inspection of the property. By a twelve to four vote, the Council recommended that the Parkway not be built but that the Carter Complex should be constructed on the site. The Council's written findings, forwarded to the Secretary of the USDOT on March 13, 1984, were largely critical of the stated need for the project and of the attempt to link the Parkway and the Complex. The FHWA responded to the comments on April 17, 1984.
 
 
 18
 On May 22, 1984, the FHWA approved the final EIS. Copies of the statement were distributed to interested parties and notice of the approval was published in the Federal Register. In addition to alternatives raised in the draft EIS, the final EIS discussed MARTA, a light rail proposal, one-way pairings of streets, staggered work hours, and toll charges and provided a more detailed discussion of the Decatur Parkway alternative.
 
 
 19
 The DOI, EPA, individuals and organizations submitted comments on the final EIS. The DOI decided that the statement did not adequately respond to the department's comments on the draft EIS and was not responsive to the requirements of section 4(f). Accordingly, the department objected to section 4(f) approval of the project.
 
 
 20
 On June 25, 1984, the chairman of the ACHP filed a formal notice of referral with the Council on Environmental Quality (CEQ). The CEQ solicited written comments from the public on the national importance of the Parkway and held a public meeting on July 17, 1984. On September 20, 1984, the CEQ determined that the proposed Parkway was not of national importance and declined to further review the project. The CEQ requested the FHWA to resume its normal decisionmaking process. On September 21, 1984, the FHWA, acting through William Van Luchene, the designee of the Secretary of the USDOT, approved and executed a record of decision.
 
 
 21
 These actions for declaratory and injunctive relief were initiated on September 24 and September 28, 1984.[7] Carter Library, Inc., the entity responsible for developing the Carter Complex, obtained title to the 3.2 acres on which the Complex would be built via a landswap with the GDOT on October 2, 1984. Construction commenced the same day.
 
 
 22
 The district court consolidated the applications for preliminary injunction with the trial on the merits. The trial was held October 22-25, 1984. By order dated November 14, 1984, the district court denied the motion to enjoin construction of the Parkway. The appeal was ordered expedited by this court. Both the district court and a panel of this court denied the appellants' motions for injunction pending appeal.
 
 I. NEPA
 
 23
 The primary objections to the EIS are twofold. First, the purpose and need section of the document did not provide a full and fair discussion of the traffic and safety justifications for the road and second, the EIS failed to consider reasonable alternatives to the roadway.
 
 A. Standard of Review
 
 24
 Section 102(2)(C) of NEPA requires that an EIS contain a "detailed statement" of
 
 
 25
 (i) the environmental impact of the proposed action,
 
 
 26
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 27
 (iii) alternatives to the proposed action,
 
 
 28
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 29
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 30
 42 U.S.C. Sec. 4332(2)(C). By detailing the environmental consequences of a proposed federal action, the EIS serves " 'to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved,' and to compel the decisionmaker to give serious weight to environmental factors." Sierra Club v. Morton, 510 F.2d 813, 819 (5th Cir.1975) (footnotes omitted).[8] The requirement of a "detailed statement" insures the integrity of the administrative process, id. at 820, and enables the reviewing court to determine that the agency with "good faith objectivity has taken a hard look at the environmental consequences of a proposed action and at alternatives to that action." Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority, 576 F.2d 573, 575 (5th Cir.1978) (per curiam). Notwithstanding this requirement, courts undertake their review with a recognition that Congress did not mandate perfection. Sierra Club v. Morton, 510 F.2d at 820. "Although the procedural requirements of NEPA must be satisfied, the courts will require only the 'statutory minima,' refusing to substitute their judgment for the judgment of the administrative agencies charged with satisfying the requirements of NEPA." Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 436 (5th Cir. Unit B 1981).
 
 
 31
 The Supreme Court of the United States has stressed that the appellate function in reviewing an environmental impact statement is a limited one. In Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Court stated:
 
 
 32
 NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.... It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals ... would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.
 
 
 33
 Id. at 558, 98 S.Ct. at 1219, 55 L.Ed.2d at 488. Our only role is to insure that the agency has taken a "hard look" at the environmental consequences of the proposed action. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576, 590 n. 21 (1976). Balancing of the substantive environmental issues is consigned to the judgment of the agency. The court "cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " Id. (quoting Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 838 (D.C.Cir.1972)). See also Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 2253, 76 L.Ed.2d 437, 447 (1983); Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433, 438 (1980) (per curiam).
 
 
 34
 Having failed to convince the district court that the EIS did not comply with NEPA,[9] the plaintiffs-appellants here must demonstrate that the district court's findings of the adequacy of the EIS are clearly erroneous or based upon an erroneous legal premise. Sierra Club v. Morton, 510 F.2d at 818. In evaluating these objections, we are governed by the "rule of reason," i.e., "we must recognize 'on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the [A]ct does not intend to impose an impossible standard on the agency.' " Id. at 819 (citations omitted). Our task is to determine whether the agency prepared the EIS objectively and whether the resulting statement permits the decisionmaker to take a "hard look" at the environmental factors. Id. See also Piedmont Heights, 637 F.2d at 436; Save our Sycamore, 576 F.2d at 575.
 
 B. Purpose and Need Section
 
 35
 The proposed Parkway is premised on the need for transportation improvements in the east-west corridor. The GDOT and the FHWA found that current traffic service in the corridor is faulty in two respects: poor operation of major arterial routes and filtering of through-traffic onto neighborhood streets. The latter deficiency is a direct result of the former. Ponce de Leon Avenue, the major east-west artery, was found to have inadequate roadway geometrics for a state route due to the lack of continuity in the number of lanes and the narrow lane width. These roadway deficiencies, when coupled with high traffic volumes and traffic friction caused by commercial development on Ponce de Leon Avenue west of Moreland Avenue, contribute to operational problems. They further found that three major intersections--Ponce de Leon Avenue at Clifton Road, Moreland Avenue and North Highland Avenue--are operating at near capacity or under forced flow conditions during peak hours. The congestion at these intersections causes traffic to divert onto local streets. By providing an alternative east-west route, the state and federal agencies postulate that traffic conditions on Ponce de Leon Avenue west of the Parkway's terminus will improve markedly due to decreased traffic volumes. They also expect the Parkway to alleviate the filtering problem. Traffic on Ponce de Leon Avenue east of the Parkway terminus would increase by 32%, but they claim that this would be traffic currently using neighborhood streets. Traffic on Moreland Avenue/Briarcliff Road would increase between 15% and 67%; traffic on Briarcliff Road north of Ponce de Leon Avenue alone would increase by 47%. The state and federal defendants contend, however, that traffic service on this route would actually improve because of reductions in cross-street traffic and intersection improvements.
 
 
 36
 These defendants further apprehend a need to improve safety conditions in the corridor. Substandard roadway geometrics, severe congestion during rush hours and filtering of traffic onto neighborhood streets cause numerous accidents. The agencies found that Ponce de Leon Avenue's accident rate was many times higher than other urban state routes. They expect the Parkway to improve safety conditions by reducing traffic on Ponce de Leon Avenue and local streets. Although traffic east of the Parkway's terminus would increase, they predict that intersection improvements will prevent a major change in accident rates.
 
 
 37
 The plaintiffs-appellants challenge the district court's determination that the EIS adequately considered the traffic and safety data.[10] They assert that the purpose and need section of the statement did not provide a full and fair discussion of the traffic and safety justifications for the road because information was omitted that did not support the perceived need for the project. These omissions thereby prevented the federal decisionmaker from making an informed and objective decision. We address each consideration in turn.
 
 
 38
 (1) Traffic
 
 
 39
 Misrepresentation of the level of service (LOS) calculations[11] for three intersections along Ponce de Leon Avenue[12] is the first criticism of the EIS. William Johnson, a transportation planner for the GDOT, testified that his calculations yielded LOS D designations for two of the intersections, Clifton Road and North Highland Avenue. The draft EIS, however, rated all three intersections as LOS F, or forced flow. In response to the draft statement, the plaintiffs-appellants submitted a photographic survey of the various intersections in an effort to prove the incorrectness of the LOS calculations. Personal observations of the intersections by neighborhood residents allegedly confirmed their position that the intersections operated at acceptable levels. The final EIS did not assign a particular letter designation to each intersection; rather, it textually described the intersections as operating at near capacity or under forced flow conditions during peak hours.[13]
 
 
 40
 Although Johnson made the mathematical calculations underlying the LOS designations, he did not actually assign the letter ratings. Record, Transcript Vol. I, at 130. Julia Bottin, Johnson's supervisor and the person responsible for preparing the purpose and need sections of the draft and final statements, reviewed the calculations, observed the intersections and drew her own conclusions as to the LOS designations. Bottin found that the intersections operated at LOS F, or forced flow, except Ponce de Leon Avenue and North Highland Avenue, which was rated at the upper limits of LOS D. Record, Transcript Vol. IV, at 40. Based on personal observations of the intersections and her own judgment, Bottin determined that the North Highland Avenue intersection should be designated as LOS F in the draft EIS. Id. at 41, 43. Extensive criticism of the traffic analysis prompted Bottin to reevaluate the data. Id. at 43. In the final EIS, she rated the North Highland Avenue intersection as operating at near capacity or forced flow conditions during peak hours. Bottin testified that she performed the analysis honestly and to the best of her ability. Id. at 44.
 
 
 41
 Contrary to the assertion of the plaintiffs-appellants, the district court order did not ignore the alleged discrepancies between GDOT's LOS calculations and the calculations ultimately assigned to the intersections. The court properly recognized that it could not designate itself as a "super professional transportation analyst," see Movement Against Destruction v. Trainor, 400 F.Supp. 533, 549 (D.Md.1975), or decide which party utilized the better methodology in conducting its level of service analysis. Rather, the district court simply determined whether the appellees' choice of methodology had a rational basis, consistently applied, taking relevant considerations into account. After reviewing all the evidence, the district court concluded that the plaintiffs failed to show that the defendants' methods of making their computations were unreasonable. Our review of the record convinces us that this finding is not clearly erroneous.
 
 
 42
 The appellants next charge that the GDOT's method of calculating levels of service exaggerated congestion because it assumed a ninety-second signal cycle at each intersection. Level of service calculations performed by Mark Skrotzki, an expert on traffic engineering testifying for the plaintiffs, indicated that the intersections would operate at LOS D by using signal timing designed to optimize intersection performance. They maintain that the EIS is inadequate because it failed to disclose this fact.
 
 
 43
 We reiterate that the court is not a "super professional transportation analyst" charged with the duty of determining the propriety of competing methodologies. Our task is simply to determine whether the EIS furnishes the "statutory minima" required by NEPA. Johnson, the GDOT employee responsible for computing the mathematical calculations underlying the department's LOS values, testified that he used standard highway manuals and followed the same procedures he had utilized in previous projects in making his LOS calculations. Record, Transcript Vol. I, at 145, 148-51. While it may have been beneficial to include information on levels of service calculations performed using optimal signal performance, there is nothing in the record to demonstrate that Johnson's choice of a ninety-second cycle was unreasonable.
 
 
 44
 (2) Safety
 
 
 45
 The plaintiffs-appellants next urge that the EIS also distorted or concealed safety data which would undercut the purported justification for the Parkway. Specifically, they allege that the EIS only compared the accident rate of Ponce de Leon Avenue with state-wide averages for "urban state routes," defined as all state roads in areas with a population of over 5,000 people. See 23 C.F.R. Sec. 470.103(b)(1) (1985). In their view, a more valid comparison with the accident rates of similar Atlanta roads would reveal that Ponce de Leon is actually a safe city artery. This assertion finds support in a summary of a 1980 briefing given to the Great Park Authority by the City of Atlanta. Plaintiffs' Exhibit 81. Second, they maintain that the EIS conceals the fact that intersections on Ponce de Leon Avenue have lower accident rates than intersections on similar roads in Atlanta and in Fulton and DeKalb Counties. In the district court, the opponents of the Parkway introduced data gathered from the Atlanta Police Department and Fulton and DeKalb County traffic engineers detailing the number of accidents at other Atlanta intersections. Plaintiffs' Exhibit 80, Attachment. The only Ponce de Leon Avenue intersection to rate among the worst in terms of accidents per year was Ponce de Leon and Juniper Street. This downtown intersection is outside the study area of the EIS. Third, the intersection accident rates contained in the EIS are distorted because they did not identify accidents caused solely by north-south traffic. Fourth, the EIS ignores safety concerns caused by an increase in traffic in areas outside the study area. As an example, appellants point to the failure of the EIS to mention the possible safety impacts on Briarcliff Road due to the 46% increase in traffic. Finally, the appellants point to the omission of GDOT's own data which shows that the majority of accidents on Ponce de Leon Avenue occur outside of peak periods. This evidence allegedly refutes the EIS's statement that Ponce de Leon Avenue is unsafe because of severe congestion during rush hours. The district court concluded that the evidence offered by the plaintiffs did not establish the unreasonableness of the defendants' consideration of the safety justification for the highway.
 
 
 46
 The EIS did contain a discussion of safety considerations. See, e.g., Final EIS, Vol. I, at 26-32, B-277 to B-286.[14] The section of the final statement detailing the purported safety hazards compared the accident rate for Ponce de Leon Avenue with statewide rates for urban state routes and with the average accident rates for urban state routes in Fulton and DeKalb Counties. Id. at 27-28. In addition, the document contained some discussion of the anticipated safety impacts on the section of Ponce de Leon Avenue east of the highway's terminus. Id. at 30, 32.
 
 
 47
 We again repeat the teachings of prior decisions binding on this court that NEPA does not mandate perfection in preparing an EIS. Sierra Club v. Morton, 510 F.2d at 820. We can overturn an administrative decision only if there are substantial procedural flaws, and not simply because we may disagree with the decision. Vermont Yankee, 435 U.S. at 558, 98 S.Ct. at 1219, 55 L.Ed.2d at 488 (emphasis supplied). Given these reminders of the limited scope of our review, we cannot say that the district court erred in finding that the EIS adequately addressed safety data.
 
 C. Alternatives
 
 48
 Section 102(2)(C)(iii) of NEPA, 42 U.S.C. Sec. 4332(2)(C)(iii), specifically requires an EIS to contain a detailed statement of alternatives to the proposed action. The alternatives section is the heart of the EIS, 40 C.F.R. Sec. 1502.14 (1984), and serves to insure that the decisionmaking body has actually considered other appropriate methods of attaining the desired goal. Sierra Club v. Morton, 510 F.2d at 825. Consideration of alternatives forces the government agency to evaluate fully the environmental effects of the proposal and to compare those impacts with the environmental consequences of the suggested alternatives. Piedmont Heights, 637 F.2d at 436.
 
 
 49
 The content and scope of the discussion of alternatives to the proposed action varies with the existing circumstances. Id. Generally, the EIS should " 'go beyond mere assertions' " by providing sufficient information and reasoning to enable readers to consider and evaluate the comparative merits of the alternatives on their own and to comment on the EIS. Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir.1975). Federal regulations require that the agency devote "substantial treatment" to and "rigorously explore and objectively evaluate all reasonable alternatives," and briefly discuss the reasons for the exclusion of alternatives eliminated from detailed study. 40 C.F.R. Sec. 1502.14(a),(b).
 
 
 50
 The procedural requirement that alternatives be considered is "bounded by some notion of feasibility." Vermont Yankee, 435 U.S. at 551, 98 S.Ct. at 1215, 55 L.Ed.2d at 484. As the Supreme Court stated in that case:
 
 
 51
 Common sense ... teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.
 
 
 52
 Id. at 551, 98 S.Ct. at 1215-16, 55 L.Ed.2d at 484. Consideration need only be given to reasonable alternatives. Piedmont Heights, 637 F.2d at 436. An EIS is satisfactory if the treatment of alternatives, when judged against a "rule of reason," is sufficient to permit a reasoned choice among the various options.
 
 
 53
 The district court, applying a "rule of reason," found the consideration of alternatives to be adequate. The appellants take issue with this finding, claiming that the EIS failed to give satisfactory coverage to any option other than the Parkway by perfunctorily dismissing other reasonable alternatives. They specifically cite improved signalization on Ponce de Leon Avenue, intersection improvements, the DeKalb Avenue/Decatur Parkway Connector, widening of Ponce de Leon Avenue, termination of the Parkway at Moreland Avenue, additional MARTA service and other miscellaneous alternatives.
 
 
 54
 The draft EIS principally discussed the building of the Parkway itself. The no-build option was dismissed in two sentences. The document also mentioned several other alternatives which were considered unreasonable, including previously developed plans for the area, a road only to the library, a road terminating at Moreland Avenue, improvements to existing streets, a two-lane Parkway, and the proposed Decatur Parkway. Public comments assailed the patent inadequacy of this discussion. In response to these criticisms, the final EIS contained a more detailed account of the no-build alternative and the Decatur Parkway. The final EIS also expanded consideration of other alternatives, including those discussed in the draft EIS, MARTA, a light rail proposal, one-way pairings of streets, staggered work hours, and toll charges. Although the EIS does not contain what some may feel is a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, we find no sufficient basis in the record to disturb the district court's conclusion that appellees adequately analyzed the alternatives.[15]
 
 II. Section 4(f)
 A. Standard of Review
 
 55
 Section 4(f) evidences Congress' response to growing public concern over the preservation of our nation's parklands, recreation areas, wildlife and waterfowl refuges, and historic sites (also referred to as section 4(f) properties). In enacting this section, Congress determined that section 4(f) properties should be accorded paramount consideration in connection with all federally financed transportation projects. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-13, 91 S.Ct. 814, 821-22, 28 L.Ed.2d 136, 151 (1971). Thus, the Secretary of Transportation[16] can approve a federal highway project requiring the use of parklands or historic sites only if (1) no feasible and prudent alternative to the use of the land exists, and (2) the project includes all possible planning to minimize harm to the property. 49 U.S.C. Sec. 303; 23 U.S.C. Sec. 138.
 
 
 56
 The Supreme Court enunciated the standard of judicial review of the Secretary's section 4(f) determination in Overton Park. While the Secretary's decision is entitled to a presumption of regularity, that presumption does not "shield his action from a thorough, probing, in-depth review." 401 U.S. at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153. A reviewing court must first consider whether the Secretary acted within the scope of her authority. Under this facet of the review, the court must determine whether the Secretary properly construed her authority to approve the use of section 4(f) property as limited to situations where there are no feasible and prudent alternatives, and whether the Secretary could have reasonably believed that no such alternatives exist. Id. at 415-16, 91 S.Ct. at 823, 28 L.Ed.2d at 153. The court must next determine whether the Secretary's ultimate decision was arbitrary, capricious or an abuse of discretion. This assessment requires an evaluation of whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416, 91 S.Ct. at 823-24, 28 L.Ed.2d at 153. Although the judicial inquiry should be penetrating, the court is not empowered to substitute its judgment for that of the Secretary. Id. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153. The third and final inquiry is whether the Secretary's action followed the necessary procedural requirements. Id. at 417, 91 S.Ct. at 824, 28 L.Ed.2d at 154.
 
 
 57
 In reviewing the district court's decision affirming the Secretary's section 4(f) action, " 'the focal point for judicial review should be the administrative record already in existence [on the basis of which the administrator's determination was made], not some new record made initially in the reviewing court.' " Louisiana Environmental Society, Inc. v. Dole, 707 F.2d 116, 119 (5th Cir.1983) (LES III ) (quoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106, 111 (1973)). Since the appellate court applies the same standard of review as the district court, we need accord no particular deference to the district court's conclusions as to whether the administrative record supports the Secretary's decision. Id. If the record fails to show a sufficient basis for the administrative decision, the 4(f) determination must be overturned. The
 
 
 58
 reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.
 
 
 59
 Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947).
 
 B. Analysis
 
 60
 The plaintiffs-appellants object to the district court's findings that the Secretary reasonably complied with the requirements of section 4(f). They do not voice any objections to the Secretary's compliance with procedural requirements. Rather, they first claim that the state and federal defendants violated section 4(f)(1) because there was no reasonable basis for the conclusion that there exists no feasible and prudent alternative to the use of parks and historic sites. Specifically, they assert that the appellees failed to examine several feasible and prudent alternatives that would avoid harm to section 4(f) areas and improperly rejected other alternatives. Second, the appellants contend that the agencies failed to incorporate all possible planning to minimize harm to protected areas as mandated by section 4(f)(2).
 
 
 61
 (1) Section 4(f)(1)
 
 
 62
 Section 4(f)(1) requires a finding of no feasible or prudent alternatives to the use of parklands and historic sites before the Secretary can approve the use of such property for highway purposes. An alternate route that also impacts upon parks and historic sites is not an "alternative to the use" of such property. Louisiana Environmental Society, Inc. v. Coleman, 537 F.2d 79, 85 (5th Cir.1976) (LES II ). Thus, in making the section 4(f)(1) assessment, the Secretary is concerned with those alternatives that do not also impact on parks and historic sites.
 
 
 63
 The Supreme Court defined "feasible" and "prudent" in Overton Park. An alternative is feasible if it can be built as a matter of sound engineering. 401 U.S. at 411, 91 S.Ct. at 821, 28 L.Ed.2d at 150. An alternative is prudent unless there are "truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reache[d] extraordinary magnitudes," or the alternative routes present "unique problems." Id. at 413, 91 S.Ct. at 822, 28 L.Ed.2d at 151.
 
 
 64
 The section 4(f) statement contained in the EIS[17] discussed five alternatives to the Parkway project: the no-build option, the Decatur Parkway, two plans for roads terminating at Moreland Avenue and widening of Ponce de Leon Avenue with improved signalization. Of these, the no-build option is the only alternative to the use of section 4(f) areas because the other proposals contemplated the "use" of parklands and/or historic districts to some degree. LES II, 537 F.2d at 85. The district court examined the consequences of not building the highway and found that the Secretary could reasonably have concluded that the no-build option was not prudent because it failed to meet the need which the project was designed to address and because it might have resulted in loss of the Carter Complex or reduction in its scope.
 
 
 65
 Despite protestations to the contrary, the district court properly interpreted LES II to provide support for its conclusion that the Secretary could reasonably have rejected the no-build option as imprudent for failure to fulfill the need for a highway in Atlanta's east-west corridor. In LES II, the former Fifth Circuit Court of Appeals held that the Secretary could reasonably have determined that two alternatives, one of them the no-build option, were imprudent because they did not serve the project's purpose. Id. The appellants' reliance on the recent decision in Stop H-3 Association v. Dole, 740 F.2d 1442 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985), in an attempt to cast doubt on the correctness of the district court's determination ignores clear precedent binding on this circuit.[18] Accordingly, since the no-build alternative could reasonably have been found imprudent, we affirm this portion of the district court's order.[19]
 
 
 66
 (2) Section 4(f)(2)
 
 
 67
 Section 4(f)(2) imposes the duty to utilize all possible planning to minimize harm to parks and historic sites before the Secretary can approve a route using section 4(f) property. Relocation of the highway through another portion of the section 4(f) area or through other section 4(f) properties must be considered as a means of minimizing harm. LES II, 537 F.2d at 85. As explained by the court in LES II, section 4(f)(2) requires a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm. Id. at 85-86. The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative. Considerations that might make the route imprudent, e.g., failure to satisfy the project's purpose, are simply not relevant to this determination. Id. at 86. If the route does not minimize harm, it need not be selected. The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites. Id.
 
 
 68
 The court in LES II made it clear that the Secretary does not have to accept an alternate route which causes less harm to parks and historic sites. Rather, the court construed section 4(f)(2) to mean that the route must also be feasible and prudent. Thus, a route that does minimize harm can still be rejected if it is infeasible or imprudent. The determination whether the route is infeasible or imprudent is based on factors other than the route's impact on section 4(f) areas. Id.
 
 
 69
 Applying this legal standard to the proposed Decatur Parkway, Moreland Avenue and Ponce de Leon Avenue alternatives, the district court found that the Secretary's determination that the alternatives either did not minimize harm or were imprudent was reasonable. As pointed out above, section 4(f)(2) requires the Secretary to utilize a balancing process that totals the harm caused by each alternative so that an option can be selected which does the least harm. Id. at 85-86. From this it is evident that the administrative record must contain adequate information to enable the Secretary to weigh the relative damage to protected properties which would result from building each of these roads. The record here is replete with references to the preferred route's impact on section 4(f) properties and to the efforts to minimize this harm. By comparison, the generalized and often contradictory attention directed to the section 4(f) impacts associated with the Decatur Parkway and Moreland Avenue routes is significantly deficient and is examined, for the most part, under the feasible and prudent standard. With the present record, it is difficult to see how the Secretary could have made the proper evaluation mandated by section 4(f)(2) of the harm caused by each of these options. A meaningful balancing of the damage done by the preferred route with that caused by the alternatives was therefore impossible. Accordingly, we are unable to review the correctness of the district court's findings as to the Decatur Parkway and Moreland Avenue plans because we conclude that the Secretary did not make the requisite findings necessary for an informed comparison of the relative harms anticipated by the construction of the various routes. It is the deficiency in this "testing" process that afflicts the integrity of the EIS. Id. at 86.[20]
 
 
 70
 The GDOT and the FHWA concluded that their five-lane version of the Decatur Parkway was not a feasible and prudent alternative because it would have used land from one or more historic districts, would have cost more than the preferred alternative, would have destroyed residences and businesses, and would have impacted an archaeological site and rapid transit facilities. Final EIS, Vol. I, at 199. The EIS generally describes the various historic sites which would be affected, either by acquisition of right-of-way or visually, and represents that a number of structures would have to be removed. The EIS also states, however, that many of these areas were physically and visually impacted by construction of MARTA's east rail line. Id. at 196. Indeed, with respect to possible effects on the Sycamore Street Historic District, the EIS states that "[b]oth the boundary and the eligibility of the district would need reevaluation before effects could be determined realistically." Id. at 197. In discussing the effect on the archaeological site, the EIS states that, according to procedures mandated by section 106 of the National Historic Preservation Act, 16 U.S.C. Sec. 470f, a finding of no adverse impact could be anticipated. Moreover, measures to mitigate harm to the site were taken following evaluative testing. Id. at 198. This candid, albeit too limited, discussion of the characteristics of the property that would be taken by construction of the Decatur Parkway, when coupled with the lack of specificity about the quantity of the affected area, convinces us that the Secretary has not conformed to the requirement that all possible planning to minimize harm be accomplished before the Secretary chooses a route impacting on 4(f) areas.[21]
 
 
 71
 The EIS discussed two road plans which would terminate at Moreland Avenue. The first, known as the Marbut Plan, consists of an east-west roadway terminating at Moreland Avenue with a related north-south road on existing right-of-way. The plan calls for a future extension eastward to Lullwater Road. The second proposal, which we will refer to as the Moreland Avenue Plan, entails construction of an east-west road ending at Moreland Avenue and the widening of Moreland and Ponce de Leon Avenue between Moreland and Clifton Road. The district court found that the Secretary could reasonably have determined that neither of the plans would minimize harm to section 4(f) areas and that the Moreland Avenue Plan was also imprudent because it did not fulfill the need for a road.
 
 
 72
 Again, we cannot evaluate the reasonableness of these conclusions because the EIS does not provide the predicate facts on which to make a reasoned judgment. Although discussion of the Marbut Plan's effect on parks and historic sites is lacking in substance, it would provide a more adequate basis for a finding that an alternative did not minimize harm than would the comments concerning the impact of the Moreland Avenue Plan.[22] The EIS acknowledges that the Moreland Avenue Plan would cause the same disruption as the Presidential Parkway up to its termination at Moreland. Id. at 204. The comments concerning this route's additional effects on historic sites bordering Moreland and Ponce de Leon Avenues are largely conclusory, however. For instance, the EIS states that widening of Moreland Avenue would adversely affect the North Highland/North Avenue Historic District but there is no mention of the type of impact, the characteristics of the property or the degree of harm that will accrue to the historic area.
 
 
 73
 Finally, the district court found that the Secretary could reasonably have concluded that widening Ponce de Leon Avenue, along with improved signalization, would have a greater effect on the Olmsted Park network and the Druid Hills Historic District. This alternative would impact on five of the Olmsted Parks and some land would be taken from the northern side of Ponce de Leon. The discussion of the quantum of harm caused to 4(f) areas by widening Ponce de Leon is the most acceptable of the 4(f) statements in the EIS. The Advisory Council on Historic Preservation is opposed to the Parkway but acknowledged that widening Ponce de Leon would undermine the integrity of the Druid Hills Historic District. Id., Appendix B, at 333, 334. We agree with this portion of the district court's opinion.
 
 
 74
 In summary, the case must be remanded to the Secretary for adequate findings of the impact on 4(f) properties caused by the Decatur Parkway and the two Moreland Avenue plans. This review should encompass an accurate assessment of the characteristics of the property that will be affected by the alternative, e.g., if the property is in a historic district, whether it has been previously impacted by commercial development and if so, to what extent. The Secretary's review must also address the quantity of harm that will accrue to the park or historic site and the nature of that harm, e.g., visual impact or physical taking. It will not suffice to simply state that an alternative route would affect 4(f) properties without providing some rational, documented basis for such a conclusion. In short, the same consideration must be given to whether these alternative routes would minimize harm to the section 4(f) properties as was accorded the adopted route.
 
 
 75
 After reviewing the voluminous record in this case, we are mindful of the tremendous task confronting the Secretary in resolving these difficult issues. However, the magnitude of the problem does not diminish the need to follow the stringent requirements of section 4(f)(2). All of the proposed routes involved in this litigation will affect parklands and historic sites to some degree. It is important then that all of these options be carefully examined in an effort to minimize the damage to section 4(f) lands. This is the command of Overton Park and LES II and we are not free to ignore that directive.
 
 
 76
 For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND to the district court for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 Section 4(f) of the Department of Transportation Act, 49 U.S.C. Sec. 1653(f), was repealed in 1983 but was recodified without substantial change at 49 U.S.C. Sec. 303
 
 
 [2]
 Section 18 of the Federal-Aid Highway Act, 23 U.S.C. Sec. 138, is virtually identical to section 4(f) of the Department of Transportation Act, 49 U.S.C. Sec. 303. For purposes of this appeal, the statutes will be referred to collectively as "section 4(f)."
 Section 4(f) states:
 (a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the country-side and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.
 (b) The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.
 (c) The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--
 (1) there is no prudent and feasible alternative to using that land; and
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 49 U.S.C. Sec. 303 (1982).
 
 
 [3]
 This section is taken substantially from the district court opinion and from the purpose and need section of the environmental impact statement
 
 
 [4]
 Morningside-Lenox Park Association, Inc. v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971)
 
 
 [5]
 The Metropolitan Atlanta Rapid Transit Authority
 
 
 [6]
 The PCR is included as Volume II of the final EIS
 
 
 [7]
 The plaintiffs included the Druid Hills Civic Association, Inc.; Inman Park Restoration, Inc.; Candler Park Neighborhood Organization; CAUTION, Inc.; various named individuals; and the National Trust for Historic Preservation
 The named defendants were the FHWA; USDOT; GDOT; EPA; R.A. Barnhart, the Administrator of the FHWA; D.J. Altobelli, Georgia State Division Director of the FHWA; Elizabeth Dole, Secretary of the USDOT; Thomas D. Moreland, Commissioner of the GDOT; and Carl Jeter, Regional Administrator of the EPA.
 
 
 [8]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981
 
 
 [9]
 The plaintiffs had the burden of showing by a preponderance of the evidence that the defendants failed to adhere to the requirements of NEPA. Sierra Club v. Morton, 510 F.2d at 818; Sierra Club v. Callaway, 499 F.2d 982, 992 (5th Cir.1974); Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, 1130-31 (5th Cir.1974)
 
 
 [10]
 The appellants do not dispute the district court's legal premise, only its findings
 
 
 [11]
 Level of service calculations describe the operating conditions of an intersection during peak periods. The calculation is a function of the configuration of the intersection and the traffic volume using the intersection. Once calculations are completed, a letter rating, ranging from A (best) to F (worst), is assigned to the intersection. LOS D is acceptable in an urban environment. LOS E means that the intersection is operating at or near capacity while LOS F represents forced flow operation. See Highway Capacity Manual, Highway Research Board, Special Report 87, at 111-13, 130-31 (National Academy of Sciences, National Research Council 1965)
 
 
 [12]
 The intersections at issue are Ponce de Leon Avenue at Clifton Road, Moreland Avenue and North Highland Avenue
 
 
 [13]
 See footnote 11 for an explanation of the letter ratings that correspond to the textual description
 
 
 [14]
 See supra, p. 709 for a summary of the EIS safety information
 
 
 [15]
 We point out that the NEPA consideration of alternatives differs from that required by section 4(f). NEPA's mandate is essentially procedural. In selecting an alternative, the decisionmaker need not elevate environmental concerns over other factors. Strycker's Bay, 444 U.S. at 227, 100 S.Ct. at 500, 62 L.Ed.2d at 437. Section 4(f), on the other hand, requires that parklands and historic sites be given paramount importance when evaluating a project. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-13, 91 S.Ct. 814, 821-22, 28 L.Ed.2d 136, 151 (1971)
 
 
 [16]
 William R. Van Luchene, acting as the Secretary of Transportation's designee, made the final determination to proceed with the Parkway project. For the sake of convenience, we use the term "Secretary" throughout this section
 
 
 [17]
 The Preliminary Case Report, included as Volume II of the final EIS, also addresses alternatives to avoid the project's impact on historic properties. The information contained in the PCR essentially duplicates that found in the EIS
 
 
 [18]
 The district court in Dole found that rejection of the no-build alternative was reasonable because the need for the road had been sufficiently established. Stop H-3 Association v. Lewis, 538 F.Supp. 149, 180 (D.Hawaii 1982). In a footnote to its discussion of the no-build option, the Ninth Circuit Court of Appeals said:
 The mere fact that a 'need' for a highway has been 'established' does not prove that not to build the highway would be 'imprudent' under Overton Park. To the contrary, it must be shown that the implications of not building the highway pose an 'unusual situation,' are 'truly unusual factors,' or represent cost or community disruption reaching 'extraordinary magnitudes.'
 740 F.2d at 1455 n. 21 (citing Overton Park, 401 U.S. at 411-13, 91 S.Ct. at 821-22, 28 L.Ed.2d at 150-51). This footnote appeared in a portion of the opinion joined by only two judges. Judge Wallace, who did not concur in the majority's analysis of the no-build alternative, was of the opinion that a project-wide no-build option did not provide a prudent alternative to a highway for purposes of the section 4(f) analysis because section 4(f) deals with the manner of building the project rather than whether to undertake it in the first place. Id. at 1466-68 (emphasis added).
 Even were we to agree that Stop H-3 Association offers a view more consistent with Overton Park, we would still be bound by our decision in LES II. See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc). Only this court sitting en banc or the United States Supreme Court can overrule precedent binding on this court. Julius v. Johnson, 755 F.2d 1403, 1404 (11th Cir.1985) (per curiam).
 
 
 [19]
 The district court concluded that loss of the Complex could constitute a truly unique or unusual factor. The court continued with the statement, "Thus, even if No-Build were prudent, the magnitude and uniqueness of the Carter Complex could justify an exception to the prudent requirement."
 Given our disposition of the section 4(f)(1) claim, it is not necessary that we determine whether possible loss of the Complex or reduction in its scope is enough to render the no-build option imprudent. Indeed, it is not certain that such an occurrence would come to pass. See Final EIS, Vol. I, at 85 ("There would also be a possibility that the no-build might include a presidential library and policy center at or near its presently proposed location."). We do note, however, that Congress enacted no exceptions to the requirement that there be no prudent alternatives to the use of parks and historic sites before the Secretary can approve a project using protected properties. As such, possible loss of the Complex would be a factor to consider in determining whether no-build was imprudent, not an event warranting an exception to the prudence requirement.
 
 
 [20]
 It is not entirely clear whether the Secretary rejected the various alternatives because they failed to minimize harm or because they were imprudent. The EIS states that the various alternatives are not feasible and prudent but then proceeds to list reasons that largely relate to the alternatives' impacts on parks and historic sites. As cautioned by the court in LES II, a route that minimizes harm may be rejected as imprudent only for reasons other than its impact on 4(f) properties. 537 F.2d at 86. On the remand, the Secretary must furnish a more specific analysis of the impact on 4(f) areas occasioned by the various alternatives. If this review results in the conclusion that the harm caused by an alternative is substantially equal to that caused by the preferred route, the Secretary is free to choose among the routes. If the alternative does minimize harm, however, it can be rejected as imprudent only for truly unusual reasons other than its impact on parks and historic sites
 
 
 [21]
 The district court found that the Secretary could reasonably have rejected the Decatur Parkway as imprudent because it did not fulfill transportation needs in the east-west corridor. Under the proper section 4(f)(2) analysis, a conclusion that an alternative was imprudent could prevent its acceptance even if it was less harmful. If we followed the district court's reasoning, there would be no need for further inquiry into the minimization of harm issue
 
 
 [22]
 Our task of determining whether there was compliance with section 4(f) was made all the more difficult by the fact that consideration of the two Moreland Avenue plans was merged into one section with little to differentiate what discussion related to which plan