CONSERVATION ALLIANCE OF ST. LUCIE COUNTY, a Florida Not–for–Profit Corporation, and Treasure Coast Environmental Defense Fund a/k/a Indian Riverkeeper, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, Anthony Foxx, in his official capacity as Secretary of the Department of Transportation; Federal Highway Administration, Victor M. Mendez, Administrator of the Federal Highway Administration; and James Christian, Division Administrator of the Florida Division of the Federal Highway Administration, Defendants.

CASE NO. 14–14192–CIV

United States District Court,
S.D. Florida.

Signed November 5, 2015

Rachel S. Doughty, Greenfire Law, Berkeley, CA, Robert N. Hartsell, Robert N. Hartsell, P.A., Sarah Morgan Hayter, Pompano Beach, FL, for Plaintiffs.

Brian Collins, Sean C. Duffy, US Department of Justice, Washington, DC, for Defendants.

## *ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT*

DONALD M. MIDDLEBROOKS, UNITED STATES DISTRICT JUDGE

This is an action brought by environmental organizations challenging the Federal Highway Administration ("FHWA") and the United States Department of Transportation's ("USDOT") approval of abridge and highway project that will cross the St. Lucie River, including the North Fork of the St. Lucie River Aquatic Preserve and the Savannas Preserve State

Park. Plaintiffs and the federal Defendants have moved for summary judgment, the federal Defendants have filed an Administrative Record Certification and Index, and the Parties have filed a Joint Appendix. The City of Port St. Lucie ("City") moved to intervene in the action. While I denied the motion to intervene, I invited the City to file a memorandum as amicus curiae. I have considered the memoranda filed by the Parties, as well as the City, and have had the benefit of oral argument.

## STANDARD OF REVIEW

Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303, and Section 18(a) of the Federal–Aid Highway Act, 23 U.S.C. § 138 (collectively "Section 4(f)") allow the Secretary of Transportation to approve a federal highway project using the land of a public park, recreation area, wildlife refuge, or historic site only if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c).

■ "This language is a plain and explicit bar to the use of federal funds for construction of highways through parks— only the most unusual situations are exempted." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Supreme Court has instructed that a reviewing court in considering a challenge under Section 4(f) "must consider whether the Secretary properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems." *Id.* at 416, 91 S.Ct. 814. "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.* (internal citations omitted). The court is "not empowered to substitute its judgment for that of the agency." *Id.* The final inquiry is whether the Secretary followed the necessary procedural requirements. *Id. See also Citizens for Smart Growth v. Secretary of Dept. of Transp.,* 669 F.3d 1203, 1216 (11th Cir.2012).

An alternative is feasible if it can be built as a matter of sound engineering. 401 U.S. at 411, 91 S.Ct. 814. *See also Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.,* 772 F.2d 700, 715 (11th Cir. 1985). An alternative is prudent unless there are "truly unusual factors presented in a particular case or the cost or community disruption resulting from alternative routes reach[ ] extraordinary magnitudes," or the alternative routes present "unique problems." 401 U.S. at 413, 91 S.Ct. 814; *Druid Hills,* 772 F.2d at 715.

Subsequent to *Overton Park,* Congress enacted The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for the Users ("SAFETEA–LU"), Pub.L. 109–59, 199 Stat. 1144, § 6009(b) (2005), which directed the Secretary of Transportation to promulgate regulations clarifying the factors and standards to be used in determining whether alternatives are prudent and feasible. *See* 73 Fed.Reg. 13368 (March 12, 2008).

The Rules define a "feasible and prudent avoidance alternative" as one that "avoids using 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property." 23 C.F.R. 774.17(1). An alternative "is not prudent" if:

(i) It compromises the project to a degree that it is unreasonable to proceed

with the project in light of its stated purpose and need;

(ii) It results in unacceptable safety or operational problems;

(iii) After reasonable mitigation, it still causes:

 (A) Severe social, economic, or environmental impacts;

 (B) Severe disruption to established communities;

 (C) Severe disproportionate impacts to minority or low income populations; or

 (D) Severe impacts to environmental resources protected under other Federal statutes;

(iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;

(v) It causes other unique problems or unusual factors; or

(vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

23 C.F.R. § 774.17 (definition of "Feasible and prudent avoidance alternative").

If there is no feasible and prudent avoidance alternative, the Section 4(f) Rules require the FHWA to determine which of the remaining alternatives will cause the least overall harm in light of the statute's purpose. 23 C.F.R. § 774.3(c). Seven factors govern this inquiry:

(i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

23 C.F.R. § 774.3(c)(1).

## BACKGROUND

Mindful that the Court of Appeals focuses on the administrative record, not the district court's opinion, and accords no particular deference to the district court's conclusions as to whether the record supports the Secretary's decision, *see, e.g., Citizens for Smart Growth,* 669 F.3d at 1216, I will strive to be concise.

The Crosstown Parkway Extension Project ("Project") is intended to alleviate substantial traffic capacity deficiencies with respect to two existing bridges—one that crosses the St. Lucie River to the north, the other to the south. The Florida Department of Transportation ("FDOT") and the City have proposed, and FHWA has approved, construction of a 6–lane, 1.96 mile-long divided highway and bridge that will extend the Crosstown Parkway from Manth Lane to the west, and across the river to U.S. 1 on the east.

The need for a third river crossing was identified as far back as 1980 in the City's comprehensive land use plan. In 1998, the County Metropolitan Planning Organization placed the Project on its priority list, and in 1999 the City adopted a resolution authorizing it to secure an easement over the St. Lucie River from the trustees of the Internal Trust Fund of Florida. The City is growing very rapidly—between 1990 and 2010, its population tripled and is

expected to reach 225,000 by 2035. The FDOT has determined that the existing bridges operate at an unacceptable level of service. Following public workshops and hearings, the City held a voter referendum for funding of the Project and a $ 165 million general obligation bond for construction was approved by 89% of voters.

The Project was developed pursuant to the FDOT Efficient Transportation Decision Making ("ETDM") process, which includes coordination and input from state and federal agencies. An Environmental Impact Statement ("EIS") was prepared that contains a Section 4(f) evaluation.

The Project area includes three Section 4(f) properties—Kiwanis Park, the Aquatic Preserve ("AP"), and the Savannas Preserve State Park ("SPSP"). Kiwanis Park is a city-owned and maintained 3.8 acre neighborhood park. The Aquatic Preserve encompasses 2,973 acres of surface water along 16 miles of the St. Lucie River. The Savannas Preserve State Park is composed of three separate parcels of land, one of which—formerly known as the North Fork St. Lucie River Buffer Preserve—is located within the Project area.

In February 2014, the FHWA issued its Record of Decision ("ROD") and Section 4(f) Determination for the Crosstown Parkway Extension. (AR03275–AR032595). The ROD was made pursuant to the June 2013 Crosstown Parkway Extension Final Environmental Impact Statement ("FEIS"; E15–2011–02–59F). The FEIS is contained within the Joint Appendix filed by the Parties and is incorporated by reference in the ROD.

The ROD concludes:

Based on the analyses contained in this Section 4(f) evaluation, unique or unusual factors are involved in the use of alternatives that avoid Section 4(f) properties, and the cost, social, economic and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes. Alternative 1C has the least net harm to Section 4(f) resources and it has been selected as the Preferred Alternative. Based on the above considerations, there is no feasible and prudent alternative to the use of land from the AP and the SPSP and the proposed action includes all possible planning to minimize harm to the AP and SPSP resulting from such use.

(AR032584).

## DISCUSSION

Plaintiffs argue that the decision to approve Extension Alternative 1C was arbitrary and capricious and a violation of Section 4(f) because Alternative 6A Spliced is a feasible and prudent alternative that avoids all use of Section 4(f) resources. The federal Defendants counter that the FHWA complied with Section 4(f), that its determinations are well-reasoned, supported by the administrative record, and are neither arbitrary or capricious. Since Plaintiffs focus on Alternative 6A Spliced, I will likewise concentrate on that aspect of the administrative decision.

 As I do so, I will use the Eleventh Circuit's three-part test: (1) whether the Secretary acted within the scope of his authority, did he construe his authority to approve projects to be limited to situations where no feasible and prudent alternatives to the use of 4(f) property existed; (2) whether the ultimate decision was arbitrary, capricious or an abuse of discretion; and (3) whether the Secretary followed necessary procedural requirements.[1] *Citizens for Smart Growth*, 669 F.3d at 1217.

---

1. Plaintiffs agree that the use of appropriate proceedings is "not at issue in this case."

(DE 39–1 at 17).

Since Plaintiff s proposed alternative is 6A Spliced, it is useful to point out particular aspects of that route. Alternative 6A is the northernmost of the six alternatives. It would extend the Crosstown Parkway along West Virginia Drive to Floresta Drive. It would then curve northeast across a residential neighborhood, over the River, and then curve eastward to the intersection of Savanna Club Boulevard and U.S. 1. Alternative 6A would directly impact 7.69 acres of wetlands, 0.15 acres of uplands, and would use 0.01 acres of the Aquatic Preserve.

█ Alternative 6A itself would not be considered during a Section 4(f)(1) review since it directly impacts the Aquatic Preserve. An alternative route that also impacts upon parks and historic sites is not an 'alternative to the use of such property.... [I]n making the Section 4(f)(1) assessment, the Secretary is concerned with the alternatives that do not also impact on parks and historic sites." *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.,* 772 F.2d 700, 715 (11th Cir.1985) (citation omitted). *See also Citizens for Smart Growth,* 669 F.3d at 1217.

Plaintiffs argue, however, that 6A could be a preferable alternative through use of different building materials. As discussed below, the FHWA determined that Alternative 6A spliced beam was not a prudent alternative.

**(1) FHWA acted within the scope of its authority and reasonably concluded that neither alternative 6A or 6A with a spliced beam construction method was a prudent alternative.**

█ Unlike *Overton Park* where there were no factual findings and no explanation that there were no feasible and prudent alternative routes or why design changes would not be made to reduce harm to the park, the record here is detailed and exhaustive. FHWA expressly applied the Section 4(f) Rules, which seem reasonably consistent with *Overton Park* and entitled to deference. *See Chevron, U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The FHWA analyzed several routes, different construction methods, two tunnel alternatives and a no build alternative. The no build alternative did not meet the project purpose and need and was eliminated as imprudent. (AR022225). The tunnel alternatives, although feasible, were eliminated as imprudent. Their cost would be substantially higher, would pose problems for hurricane evacuation because of flooding, and would require more right of way acquisition than a bridge. (AR022339–AR022348).

Each of the remaining build alternatives impacted a Section 4(f) property. All of the alternatives resulted in a use of the St. Lucie River and all, except 6A, used the SPSP. (Alternative 6A would use shoreline just north of the boundary of the SPSP.). As detailed in Section 6.2 of the FEIS (Avoidance alternatives), Section 6.3 (Measures to minimize harm), Section 6.4 (Use of Section 4(f) properties), and Section 6.6 (Evaluation of Alternatives), no alternatives exist to avoid a new crossing of the River.

As noted above, Plaintiffs contend that although Alternative 6A would place pilings in the River, use of a different construction method could avoid that impact. They contend that a spliced beam construction would allow the bridge to span the river, and since the bridge would come ashore just north of the SPSP, this alternative would be a prudent alternative that would avoid all use of Section 4(f) resources.

However, FHWA evaluated the Spliced Beam Construction Alternative.

(AR022711). [2] It was determined that the amount of land used for spliced beam support structures would be far greater than pile bent support structures because the footings are 15 times larger to support the additional loads. [3] This would impact wetlands and essential fish habitat (non-Section 4(f)) resources and the South Florida Water Management District expressed a preference for the placement of piers in the River as opposed to additional impacts on adjacent wetlands. (AR022711–022712). Impacts to adjacent habitat of non-Section 4(f) resources would be 69 times greater for the spliced beam bridging option for Alternative 6A than for using a pile bent structure for Alternative 6A. (AR022712). The FHWA found the bridging option with a pile bent substructure to be the most viable and least harmful option to crossing the River even though this option does requires piers in the AP. This finding appears reasonable.

Apart from the method of construction, the FHWA found the route of Alternative 6A to be imprudent. Of the build alternatives it had "the most severe and immitigable social impacts to communities on both sides of the [North Fork of the St. Lucie River]." (AR022733). The western portion would cross diagonally across six residential streets, creating substantial community cohesion (FEIS Section 5.1.1.12, Community Cohesion) and local mobility impacts (Section 5.1.1.4, Mobility) through an established residential area, as well as substantial visual (Section 5.3.2.2, Views from Adjacent Lands of the Proposed Road and Bridge) and noise impacts (Section 5.3.4.5, Noise Barrier Analysis). It would also require relocation of the access

road into the La Buona Vita community and substantially change traffic flows within the retirement community. Alternative 6A also affects neighborhoods with a higher number of minority households. (AR022553). The FHWA found Alternative 6A to have "a collective adverse social impact to the neighborhoods on both sides of the river" and "would result in the most harm to non-Section 4(f) resources compared with all other build alternatives." (AR022733). This finding likewise appears to be reasonable and supported by the record.

**(2) The ultimate conclusion that Alternative 1C will cause the least overall harm is not arbitrary and capricious.**

While Alternative 6(A) Spliced was determined to be imprudent, this is only the first half of the Section 4(f) inquiry. Section 4(f)(2) requires that all possible planning to minimize harm must be accomplished before a route that crosses 4(f) properties can be approved. This requires a balancing process that totals the harm caused by each alternate route to Section 4(f) areas and selects the option that does the least harm. *Citizens for Smart Growth*, 669 F.3d at 1216 (citation omitted).

The reasoning process underlying 4(f)(1) and 4(f)(2) must be kept entirely separate. "A route may be rejected because it does not minimize harm only for reasons relevant to the quantum of harm which will be done to the recreational area. If it does minimize harm, a route may be rejected only for truly unusual factors oth-

2. Prestressed Post Tension (Spliced) Beams is a bridging option that allows for longer spans through use of multiple prestressed concrete beams connected together. (AR022711).

3. In the case of a bridge, Section 4(f) generally would apply only if piers or other support

structures are physically located within the waterway. If a bridge can completely span the Section 4(f) property and can avoid the placement of support structures, "proximity impacts" must be evaluated. (EIS, AR022688).

er than its effect on the recreational area." *Louisiana Environmental Soc., Inc. v. Coleman*, 537 F.2d 79, 85–86 (5th Cir. 1976).

In conducting its least harm analysis, the FHWA explicitly made findings balancing the seven factors outlined in 23 C.F.R. § 774.3(c)(1) as to each alternative. (AR022726–AR022733). The first factors relate to the net harm that each alternative would cause to the Section 4(f) property. The final three factors consider any substantial problems on issues beyond Section 4(f).

As to Alternative 1C, the FFIWA found relatively modest impacts, particularly in light of the mitigation plan, which will result in a net benefit to Section 4(f) resources. (AR022729). The mitigation plan includes four water quality improvement projects, which will improve river flows and reconnect 28.05 acres of degraded wetlands; increase state ownership of lands within the SPSP by 108.55 acres; and make improvements to the Halpatiokee Canoe and Nature Trial, the Savannas Recreation Area, and the Savannas Preserve Education Center. (AR022759). The Florida Department of Environmental Protection ("FDEP"), the agency with ownership and jurisdiction over the AP and SPSP, agreed that the mitigation plan fully compensates for the impact and agreed to provide the required easement for Alternative 1C. (AR022730).

The FHWA found that Alternative 1C would meet the purpose and need for the Project to a higher degree than any other build alternatives by providing the most balanced traffic relief for the two existing bridges. (AR022730). 6A, the route preferred by Plaintiffs, would provide the least amount of traffic diversion from Port St. Lucie Boulevard compared to all other build alternatives. (AR022239).

Moreover, the FHWA found that Plaintiffs' preferred route would have "the most severe and immitigable social impacts to communities on both sides of the [River.]" (AR022733). "From a least harm perspective," the FHWA eliminated the route from further consideration, "because it would result in the most harm to non-Section 4(f) resources compared with all other build alternatives." *Id.*

The FHWA concluded that "Alternative 1C has the least net harm to Section 4(f) resources and it has been selected as the Preferred Alternative.... [T]here is no feasible and prudent alternative to the use of land from the AP and the SPSP and the proposed action includes all possible planning to minimize harm to the AP and the SPSP resulting from such use." (AR022748).

I see nothing arbitrary or capricious in the FHWA findings. Having conducted a careful and searching inquiry into the administrative record, I discern no clear error in judgment. The FHWA considered the relevant factors and its determinations are supported by the administrative record.

Plaintiffs basically argue that the FHWA simply rubber stamped a locally-preferred alternative resulting from a flawed analysis employed by the City that ignored Section 4(f) concerns. But it is the FHWA, not the City, that is responsible for application of Section 4(f).

And I do not find it surprising that the FHWA and the City agree about the preferred alternative. As Plaintiffs' counsel pointed out in her oral argument, it is the policy of the State of Florida "to conserve and protect its natural resources and scenic beauty." Article II, Section 7, Florida Constitution. While the City's analysis and scoring mechanism did not specifically refer to Section 4(f), it did evaluate natural environment impacts, including gross and net impacts on wetlands, upland habitats, essential fish habitat, and federal-state

protected species. (AR022441–AR022446). It also included public and agency comments. (AR022450).

The lengthy, comprehensive, and collaborative process detailed in the administrative record contains no indication that the City, its residents, or state environmental agencies lacked commitment to the protection and preservation of the River and Preserve, which after all are state resources. The fact that collaboration led agencies with different perspectives and responsibilities and employing separate analysis, to a singled preferred alternative is not a flaw but a desirable result.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of the federal Defendants. Plaintiffs' motion for summary judgment is denied.

Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment (DE 39) is **DENIED** and Defendants' Motion for Summary Judgment (DE 45) is **GRANTED.**

**DONE and ORDERED** in Chambers at West Palm Beach, Florida this 5 day of November, 2015.